1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

SPACE NEEDLE LLC, a Washington
limited liability company,

                    Plaintiff,

          v.

NORTH AMERICAN ELITE
INSURANCE COMPANY, a New
Hampshire corporation,

                    Defendant.

NO.

**COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF**

Plaintiff Space Needle LLC ("Space Needle") brings this complaint against Defendant North American Elite Insurance Company ("Elite") and alleges as follows.

## PARTIES

1.      Space Needle is a limited liability company organized under the laws of the State of Washington. Its principal place of business was formerly located on 203 Sixth Avenue North in Seattle, Washington, and is currently located a short distance away at 223 Taylor Avenue North, Seattle, Washington. For years, Space Needle has owned and operated the iconic structure known as the Space Needle in Seattle, Washington.

COMPLAINT - 1

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

2.      Space Needle has two members, both of whom are entities organized under the laws of the State of Washington, with their principal place of business in Seattle, Washington. The first is Space Needle Management LLC ("Management"). The second is Space Needle Holding Corporation, a Washington for-profit corporation ("Holding"). Holding is Management's sole member.

3.      Elite is a corporation organized under the laws of the State of New Hampshire. Elite has variously reported its principal place of business to be located in New York or Missouri. Elite advertises that it is an admitted insurance carrier authorized to transact insurance business in all US states. Elite is an admitted insurer in Washington and Elite transacts the business of insurance within this State and in this judicial district.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of the subject matter of this action under 28 U.S.C. §1332, as there is complete diversity between the parties thereto and the amount in controversy exceeds $75,000.

5.      This Court has personal jurisdiction over Elite because this action arises from the transaction of business in the State of Washington, RCW 4.28.185(1)(a) and from the insuring of persons and property in this State, RCW 4.28.185(1)(b).

6.      Venue lies in the Western District of Washington under 28 U.S.C. § 1391. First, the events giving rise to the claims asserted in this Complaint, and the property that is the subject of this action, is situated in this judicial district. Second, Elite is an entity with the capacity to sue and be sued in its common name which is subject to this Court's personal jurisdiction with respect to this civil action. Third, an insurance company doing business in the State of Washington must, if admitted, appoint the Insurance Commissioner of the State of Washington

COMPLAINT - 2

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

FG:11529064.2

1    as its agent for service of process, and must have, or are deemed to have,

2    submitted to service of process within the State of Washington. Fourth, no policy

3    issued for delivery in Washington and covering property in Washington may

4    include a forum selection clause in favor of another state pursuant to

5    RCW 48.18.200.

6                                    OPERATIVE FACTS

7    **I.    Elite sells an insurance policy to Space Needle as the first named
8           insured, and issues it for delivery in Washington.**

9         7.    Space Needle operates the Space Needle, a structure built during the

10   1962 World's Fair in Seattle.

11        8.    The Space Needle is a well-known structure with a unique

12   architectural design, and is often identified as one of the top places for tourists to

13   visit while in Seattle. Best known among its attractions are its two levels located

14   over 500 feet above the ground below. For a fee, visitors reach these levels through

15   a glass-walled elevator that speeds to the top at 10 miles per hour. There, visitors

16   find a variety of attractions, including an outside view deck that completely circles

17   the structure, and a lower floor with a rotating glass floor, which allows visitors to

18   look directly below their feet to the earth. A significant proportion of the revenues

19   generated by the Space Needle come from fees that visitors pay to travel to the

20   upper levels.

21        9.    In 2019, Elite sold Space Needle a "Leading Edge All-Risk Form"

22   insurance policy (the "Policy"). The Policy number was NAP 2001943-01 and the

23   Policy Period ran from June 30, 2019 until June 30, 2020. The Policy contained a

24   "Policy Limit of Liability" of $160,000,000. A copy of the Policy is appended hereto

25   as Exhibit 1.

26

COMPLAINT - 3

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

10.     Elite sold the Policy to Space Needle as the "First Named Insured." It recited that Space Needle's mailing address was "203 Sixth Avenue N, Seattle, WA 98109."

11.     Elite sold the Policy to Space Needle through Parker, Smith & Feek Inc., an insurance broker based in Bellevue, Washington.

**II.     In the Policy, Elite promised to insure Space Needle against a variety of losses, including losses due to disease or government-imposed access restrictions.**

12.     In the Policy, Elite promised Space Needle that it would cover losses relating to "direct physical loss and damage" insured by the Policy, including but not limited to, loss or damage related to property on "insured locations" within the State of Washington, including the Space Needle itself. The Policy provided both "property damage" coverages and "time element" coverages.

13.     The phrase "direct physical loss and damage" extends beyond the mere structural alternation of tangible property. Rather, it extends to any loss of ability to use property for its intended purpose.

14.     Among the items Elite promised to insure against in the "time element" coverages were "gross earnings" lost and "extra expense" incurred during the "period of liability" due to direct physical loss or damage to specified property. The Policy defines these terms and sets for the means by which to determine the amount of "gross earnings" and "extra expense" loss.

15.     The Policy's basic "gross earnings" coverage insures the net loss sustained by Space Needle due to the interruption of Space Needle's business during the "period of liability."

16.     The Policy's basic "extra expense" coverage insures certain reasonable and necessary costs incurred during the "period of liability" in order to continue the business.

COMPLAINT - 4

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

17. The Policy defined the "period of liability," in relevant part to extend from the date that "physical loss or damage" began until the date when lost or damaged property could be repaired or replaced and made ready for operations.

18. Under the Policy's extended period of liability coverage, the Policy extended coverage for an additional 365 days after the end of the "period of liability."

19. In addition to the Policy's "gross earnings" and "extra expense" coverage, and its "extended period of liability" coverage, the Policy offered a number of other "time element coverage extensions." These include "Attraction Property," "Contingent Time Element," "Ingress/Egress," "Interruption by Communicable Disease," and "Order of Civil or Military Authority" coverage. Each of these extensions may extend to cover some or all of a "gross earnings" or "extra expense" loss, subject to its own specified sublimit, as follows.

a. "Attraction property" coverage extends to gross earnings and extra expense incurred due to physical loss or damage to a property not owned or operated by Space Needle that directly attracts business to Space Needle's insured locations.

b. "Contingent time element" coverage extends to gross earnings and extra expense incurred due to physical loss or damage to property at locations of suppliers or customers that prevents suppliers from supplying, or customers from receiving, goods of services to or from Space Needle.

c. "Ingress/Egress" coverage extends to gross earnings and extra expense incurred due to the prevention of ingress to or egress from insured locations due to physical loss or damage to property, including property not insured by the Policy.

COMPLAINT - 5

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

FG:11529064.2

d.      "Interruption by Communicable Disease" coverage extends to gross earnings and extra expense incurred due to access restrictions imposed in response to the presence of "communicable disease" at an insured location.

e.      "Order of Civil or Military" coverage extends to gross earnings and extra expense incurred due to a civil or military order issued in response to direct physical loss or damage, and which prohibits partial or total access to an insured location.

20.      The Policy's coverage extends beyond losses resulting from structural alteration or damage to property.

21.      The Policy does not contain an exclusion for loss due to viral disease. Indeed, the Policy's only mention of disease is in connection with its *extension of coverage* for "communicable disease." The Policy's definition of "communicable disease" extends to any disease that is "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges." This definition is broad enough to included diseases caused by viruses, including Covid-19, a disease caused by the SARS-CoV2 virus.

22.      The Policy contains an exclusion for "contaminants" that is virtually identical in form and substance to what the Washington Supreme Court has referred to as "pollution exclusions." The exclusion applies to the "discharge, dispersal, seepage, migration, release, or escape of contaminants, i.e., pollution. It does not apply to viral disease.

23.      The Policy purports to require the "construction and interpretation" of the Policy to be decided under New York law. It does not state that New York law governs other matters, such as the enforceability and validity of Policy provisions and claims that do not arise under the Policy. RCW 48.18.200 prohibits such provisions in policies, like the Policy, that are issued for delivery in

COMPLAINT - 6

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

Washington to cover Washington risks. The choice of law provision is void. Washington law applies.

24.     The Policy purports to make New York the exclusive venue for hearing disputes regarding the Policy. Again, RCW 48.18.200 prohibits such provisions in policies, like the Policy, that are issued for delivery in Washington to cover property located in Washington. The Policy's venue provision is void.

**III.     Space Needle suffers substantial losses relating to the presence of Covid-19 and to Proclamations by Washington Governor Jay Inslee.**

25.     In early 2020, the SARS-CoV-2 virus reached the State of Washington. By March 2020, many residents in Washington had contracted the disease caused by this virus, Covid-19.

26.     Scientific and medical research regarding the various paths through which this virus spreads is ongoing. Initially, there was a widespread belief that the virus most efficiently spread by touch; individuals became infected, it was thought, through physical contact with infected individuals and infected surfaces. By March 2021, it became apparent that the virus could readily volatilize through the breathing of infected individuals, allowing the virus to sicken individuals who came near those who were already infected, especially in closed or small indoor spaces.

27.     The SARS-Cov-2 virus is widely believed to have a latency period of between five and fourteen days. In other words, an infected individual does not develop symptoms of the disease until at least five days after becoming infected.

28.     As of January 2021, Space Needle had become aware that five individuals had tested positive for Covid-19. Four were Space Needle employees, two of whom were asymptomatic when they tested positive. Each employee was at the Space Needle within 48 hours of the onset of symptoms or, in the case of the

COMPLAINT - 7

Foster Garvey PC
1111 Third Avenue, Suite 3000
Seattle, Washington 98101-3296
Phone (206) 447-4400  Fax (206) 447-9700

asymptomatic employees, of their positive Covid-19 test. Meanwhile, one guest notified Space Needle of a positive Covid-19 test shortly after visiting the Space Needle.

29.     In response to the public health emergency, Washington Governor Jay Inslee declared a state of emergency on February 29, 2020.

30.     On March 11, 2020, Governor Inslee issued Proclamation 20-07, which imposed some initial restrictions to combat the spread of Covid-19.

31.     The Governor then issued Proclamation 20-13 on March 16, 2021. This Proclamation declared that "to curtail the spread of the COVID-19 pandemic in Washington State and protect our most vulnerable populations, it is necessary to immediately prohibit any number of people from congregating in public venues for purposes of public entertainment, recreation, food or beverage service, theater, bowling, and other similar activities, in order to limit opportunities for disease exposure and transmission in the State."

32.     Nine days later, Governor Inslee issued Proclamation 20-25, which took effect on March 25, 2020. Initially entitled "Stay Home, Stay Healthy," Proclamation 20-25 has been extended and modified several times. Among other things, Proclamation 20-25 declared that "people in Washington State are immediately prohibited from leaving their home or place of residence except to conduct or participate in (1) essential activities, and/or (2) employment in providing essential business services." This Proclamation also directed "all people in Washington," with certain limited exceptions, to "cease participating in all public and private gatherings and multi-person activities for social, spiritual and recreational purposes, regardless of the number of people involved. Such gatherings and activities included "community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and

COMPLAINT - 8

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400 FAX (206) 447-9700

FG:11529064.2

similar activities." The Proclamation further directed that "all non-essential businesses in Washington State shall cease operations except for performing basic minimum operations."

33.    These events had an immediate and severe impact on Space Needle. The Space Needle's tourist attractions did not constitute an essential business and, further, it could not host public or private gatherings. Customers, too, were prohibited from visiting or entering the Space Needle.

34.    Subsequently, Space Needle has been able to resume limited operations since March 2021. But access to the site by customers is still highly restricted.

35.    As result of the interruption of Space Needle's business, Space Needle has lost millions of dollars in revenues, resulting in losses that continue to mount.

**IV.    Space Needle gave notice of the loss of its claim, but Elite has failed to accept the claim and has cited Policy provisions that reveal Elite's intention to deny coverage.**

36.    On or about March 30, 2020, Space Needle gave Elite written notice of its loss and of a claim for coverage under the Policy. Space Needle did so through an Acord form "property loss notice" prepared and submitted by Parker Smith & Feek, Inc.

37.    Nearly a year has passed since Space Needle supplied that notice, but Elite has not accepted coverage. Instead, Elite has submitted a list of over a dozen questions. Many of those questions sought information that was already available to Elite, or that were so broad in scope as to be practically meaningless. For example, Elite asked if there were "any Executive Orders from the President of the United States, as well as local and state authorities, applicable to your business" and if "there is an end date for any such order(s)."

COMPLAINT - 9

FOSTER GARVEY PC
1111 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98101-3296
PHONE (206) 447-4400  FAX (206) 447-9700

FG:11529064.2

39.     Space Needle collected some information to assist Elite, expecting that there would be dialog around what questions had been resolved or narrowed, and what was needed next. Instead, without inviting such a dialog, Elite sent a letter falsely claiming that "Space Needle provided no response to the Requests for Information" and demanding a complete response to them including, apparently, the request for information about presidential orders.

40.     Elite also wrote to suggest a number of potential Policy provisions that merited a denial of coverage. Space Needle provided a detailed legal explanation why those provisions did not support Elite's position. Elite did not respond in substance to these points, and ignored them.

41.     Upon information and belief, though it has not formally done so yet, Elite has decided to deny coverage. Moreover, Elite has failed to timely accept coverage in compliance with the terms of the Policy.

## CAUSES OF ACTION

### I.     Claim 1: Breach of Contract

42,     Space Needle incorporates paragraphs 1 through 41 as though fully set forth herein.

43.     The Policy constitutes a binding and enforceable contract under Washington law.

44.     Elite's acts and omissions, as set forth above, constitute a breach of the Policy and, therefore, a breach of contract.

45.     As a direct and proximate result of Elite's breach, Space Needle has been injured and has suffered damages in an amount to be proven at trial, but in excess of $75,000.

COMPLAINT - 10

FG:11529064.2

1    **I.      Claim 2: Declaratory Judgment**

2         46.     Space Needle incorporates paragraphs 1 through 45 as though fully

3    set forth herein.

4         47.     Upon information and belief, Elite intends to deny coverage.

5         48.     As a result of Elite's refusal to accept coverage and intent to deny it,

6    there now exists and actual controversy between parties with opposing interests.

7         49.     A declaration of the respective rights and duties of Space Needle and

8    Elite under the Policy is necessary and proper at this time, as it will foster a

9    speedier and more timely resolution of Space Needle's claim for coverage, and

10   prevent losses from continuing to accrue with no source of funds to meet them.

11                              REQUEST FOR RELIEF

12        WHEREFORE Plaintiff Space Needle LLC prays for the following relief:

13        1.      A judgment in favor of Plaintiff and against Defendant in an amount

14   to be proven at trial;

15        2.      A declaration of Plaintiff's rights and Defendant's obligations under

16   the Policy;

17        3.      An award of Plaintiff's costs of suit, including attorney and expert

18   fees; and

19        4.      Such other and additional relief as this Court deems just and

20   equitable.

21        DATED this _12th_ day of March, 2021.

22                                        FOSTER GARVEY PC

23

24                                        By _____

25                                           Donald B. Scaramastra, WSBA #21416

26

COMPLAINT - 11

FG:11529064.2

**EXHIBIT 1**





SP 5 369 0514

Insurance Products underwritten by Westport Insurance Corporation, First Specialty Insurance Corporation, North American Capacity Insurance Company, North American Specialty Insurance Company, North American Elite Insurance Company, Washington International Insurance Company, or Swiss Re International S.E.

Swiss Re Corporate Solutions offers innovative, high-quality insurance capacity for single and multi-line programmes worldwide, either on a standalone basis or as part of structured and tailor-made solutions. In addition, it provides customised risk transfer solutions to mid-sized and large, multinational corporations across the globe to assist in mitigating their risk exposure. Swiss Re Corporate Solutions serves more than 60,000 customers across nearly 40 offices worldwide and is backed by the financial strength of the Swiss Re Group. For more information about Swiss Re Corporate Solutions, please visit: www.swissre.com/corporatesolutions.

©2014 Swiss Re. All rights reserved.

# *North American Elite Insurance Company*

## PREMIUM PAYMENT NOTICE TO INSUREDS AND PRODUCERS

This policy has been specifically prepared for you. A separate premium invoice has been prepared and forwarded as appropriate. Payment of premium to North American Elite Insurance Company is expected within 30 days of the invoice date for Domestic premium and within 60 days of the invoice date for Foreign premium. Failure to pay the premium by the due date shall be considered nonpayment of premium.

Premium will be billed in U. S. dollars, and is payable in U. S. dollars. Premium for locations outside the U. S. may, if you elect, be paid in the currency of the country within which the risk is located. Conversion of the U. S. dollar amount due into foreign currency shall be at the exchange rate as of the effective date of the coverage being invoiced.

NOTICE: Payment for Canadian location(s) premium is expected to be paid to Westport Insurance Corporation, 150 King Street West, Suite 1000, Toronto, Ontario M5H 1J9. Refer to the invoice for bankwire instructions.

Payment to North American Elite Insurance Company may be accomplished by either mail, or bankwire, to the following addresses:

### Checks by mail

**Payable to:**
North American Elite Insurance Company
PO Box 418505
Boston, MA 02241

**Overnight Address**
Bank of America Lockbox Services
North American Elite Insurance Company MA5-527-02-07
PO Box 418505
2 Morrissey Blvd
Dorchester, MA 02125

**Correspondence Only Address**
North American Elite Insurance Company
1200 Main Street, Suite 800
Kansas City, MO 64105

### $USD Bankwires

**Payable to:**
North American Elite Insurance Company
Bank of America
2000 Clayton Rd, Bldg D
Concord, CA 94520
Acct No. 1291376737
WIRE ABA No. 026009593
WIRE ACH No. 121000358
SwiftCode: BOFAUS3N (SUSD Only)

Include copy of invoice or backup with check. Email copy of invoice or backup to Marilyn_Page@SwissRe.com. Fax copy of invoice or backup to: 913-676-3300.

Call 913-676-3226 for bankwire instructions on all foreign currency payments.

*North American Elite Insurance Company*

## HURRICANE LOSSES – NAMED WINDSTORM

**THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE LOSSES, WHICH MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU.**

**THIS SAME DEDUCTIBLE ALSO APPLIES TO A NAMED WINDSTORM, REGARDLESS OF WHETHER SUCH NAMED WINDSTORM CONSTITUTES A HURRICANE OR NOT. THE MEANING OF THE TERM "NAMED WINDSTORM" AND THE AMOUNT OF THE NAMED WINDSTORM DEDUCTIBLE ARE STATED IN THIS POLICY. PLEASE READ THESE PROVISIONS CAREFULLY.**

# *North American Elite Insurance Company*

## POLICY NOTICE

## THIS POLICY PROVIDES NO COVERAGE
## FOR LOSS DUE TO A CERTIFIED ACT OF TERRORISM

In accordance with the instructions received by North American Elite Insurance Company ("the Company"), this POLICY DOES NOT provide coverage for INSURED LOSS due to an act of terrorism that is certified (CERTIFIED ACT OF TERRORISM) pursuant to the Terrorism Risk Insurance Act or for any other loss due to terrorism.

## APPLIES TO U.S. LOCATIONS AND LOCATIONS OUTSIDE THE U.S.
## IN THE CASE OF AIR CARRIERS, VESSELS, AND THE PREMISES OF U.S. MISSIONS

By accepting this POLICY, the Insured and its authorized representatives acknowledge and confirm that: (1) coverage for INSURED LOSS due to a CERTIFIED ACT OF TERRORISM, was offered to the Insured by the Company in writing (the "Coverage"); (2) the offer of Coverage included a clear and conspicuous statement of the proposed premium charge for the Coverage, written advice concerning the United States Government, Department of the Treasury's program for reimbursing a portion of such Insured Loss and written advice concerning the cap on insurer participation in the payment of terrorism losses; (3) the Insured does not desire to purchase the Coverage and has declined the offer; (4) no part of any premium paid to the Company by or on behalf of the Insured is for the Coverage; and (5) the Company is under no obligation to offer this coverage to the Insured again during the Policy Period to which this POLICY applies.

## THE EFFECT OF THIS NOTICE

This notice does not constitute any part of the POLICY's terms and conditions for the purpose of determining coverage, and it does not alter, limit or waive any of the terms and conditions of the POLICY. If there is any discrepancy between this notice and the terms and conditions of the POLICY, the POLICY terms and conditions shall be controlling.

# *North American Elite Insurance Company*

## LOSS REPORTING PROCEDURES

Welcome to North American Elite Insurance Company, a member company of Swiss Re Corporate Solutions. We would like to take this opportunity to share our loss-reporting procedures. In the event of a loss or potential loss, please immediately complete and forward a First Notice of Loss on an ACORD Loss Form. If you do not use the ACORD Loss Form please otherwise provide the following information:

- Your Name and Contact Information (including e-mail address)
- Name of Insured/Policy Holder and/or Policy Number
- Contact Details of Insured Representative and Preferred Method of Contact
- Date of Loss
- Location of Loss
- Brief Summary of the Loss
- Contact Name(s) and e-Mail Address(es) for New Loss Acknowledgement Letter

Forward the New Loss Details by one of the following methods:

By e-mail:   ClaimsNAProperty_CorporateSolutions@swissre.com


By Mail:   North American Elite Insurance Company
             Attention: Corporate Solutions Claims
             1200 Main Street, Suite 800
             Kansas City, MO 64105

Please visit us on our website: www.swissre.com/corporatesolutions

This notice is for information only and does not become a part or condition of the policy.

## WASHINGTON COMMERCIAL DEREGULATION

The rates and forms to be used are exempt from the filing and approval process and have not been reviewed by the Insurance Commissioner.

# *North American Elite Insurance Company*

## LEADING EDGE ALL-RISK FORM

### First Named Insured:

Space Needle, LLC
203 Sixth Avenue N
Seattle,WA 98109

### Policy Number:

NAP 2001943-01

**This POLICY contains clauses that may limit the amount payable.**

### A. Insuring Agreement

1.  Subject to the terms, conditions, exclusions and limitations contained herein or endorsed hereon and in consideration of the premium paid, this POLICY, of which this page forms a part, insures all risks of direct physical loss or damage to INSURED PROPERTY while on INSURED LOCATION(S) provided such physical loss or damage occurs during the term of this POLICY.

2.  The term of this POLICY ends when the first of the following occurs:

    a.  cancellation of this POLICY by the First Named Insured or by the Company;

    b.  the replacement POLICY takes effect; or

    c.  the POLICY expiration date.

### B. Claims Notification

To report a claim under this POLICY:

By E-mail:   ClaimsNAProperty_CorporateSolutions@swissre.com

By Fax:   Send to the attention of "Corporate Solutions Claims" at (860) 902-7149

By Mail:   North American Elite Insurance Company
Attention: Corporate Solutions Claims
1200 Main Street, Suite 800
Kansas City, MO 64105

### C. Conformity to Statute

Any provision or stipulation of this POLICY which is in conflict with the applicable statutes of the state(s), province(s) and territory(ies) is hereby amended to conform to such statutes.

Applies to INSURED LOCATIONS in New York State, if any:

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**In Witness Whereof**, *the issuing Company has caused this policy to be signed officially below.*

_____          _____

President                                          Secretary

North American Elite Insurance Company
_____

## LEADING EDGE ALL-RISK FORM
## GENERAL PROPERTY
## DOMESTIC

## TABLE OF CONTENTS

| | | |
|---|---|---|
| SECTION I DECLARATIONS | | 7 |
| A. | Issuing Company - (hereafter referred to as "the Company") | 7 |
| B. | Policy Number | 7 |
| C. | Insured | 7 |
| D. | First Named Insured and Mailing Address | 7 |
| E. | Policy Period | 7 |
| F. | Inception and Expiration Time | 7 |
| G. | Gross Premium | 8 |
| H. | Currency | 8 |
| I. | Policy Territory | 8 |
| J. | Sanctions Clause | 8 |
| SECTION II POLICY LIMITS AND SUBLIMITS PURCHASED OR NOT PURCHASED | | 9 |
| A. | Program Limit of Liability | 9 |
| B. | Company's Policy Limit of Liability and Application | 9 |
| C. | Application of Program Sublimit(s) | 9 |
| D. | Coverage Purchased and Coverage Not Purchased | 10 |
| E. | Time Limit(s) | 10 |
| F. | Distance Limit(s) | 11 |
| G. | Time Element Coverage Extensions - Application of Limits | 12 |
| SECTION III POLICY DEDUCTIBLES AND WAITING PERIODS | | 13 |
| A. | Policy Deductibles | 13 |
| B. | Application of Deductibles | 13 |
| C. | Waiting Periods | 15 |
| SECTION IV PROPERTY DAMAGE | | 16 |
| A. | Insured Property | 16 |
| B. | Property Damage Coverage Extensions, Terms and Conditions | 16 |
| | 1. Accounts Receivable | 16 |
| | 2. Brands and Labels | 17 |
| | 3. Communicable Disease Response | 18 |
| | 4. Control of Damaged Property | 18 |
| | 5. Course of Construction | 18 |
| | 6. Data Restoration | 19 |
| | 7. Debris Removal | 19 |
| | 8. Defense Costs | 20 |
| | 9. Demolition and Increased Cost of Construction | 20 |
| | 10. Destruction by Civil or Military Authority | 20 |
| | 11. Errors and Omissions | 20 |
| | 12. Exhibitions, Expositions, Fairs or Trade Shows | 21 |
| | 13. Expediting Expenses | 21 |
| | 14. Fine Arts | 22 |
| | 15. Fire and Police Department Service Charges | 22 |
| | 16. Installment or Deferred Payments | 22 |
| | 17. Infrastructure System Coverage | 23 |
| | 18. Land and Water Contaminants, Cleanup, Removal and Disposal | 23 |

|  | 19. | Miscellaneous Unnamed Locations | 23 |
|  | 20. | Newly Acquired Property | 24 |
|  | 21. | On Site Construction | 24 |
|  | 22. | On Site Service Interruption | 24 |
|  | 23. | Professional Fees | 24 |
|  | 24. | Protection and Preservation of Property – Property Damage | 25 |
|  | 25. | Radioactive Contamination | 25 |
|  | 26. | Service Interruption – Property Damage | 25 |
|  | 27. | Temporary Removal of Property | 26 |
|  | 28. | Transportation | 26 |
|  | 29. | Vacancy | 27 |
|  | 30. | Valuable Papers and Records | 28 |

**SECTION V TIME ELEMENT** ... 29
A. Loss Insured ... 29
B. Gross Earnings ... 29
C. Gross Profits ... 30
D. Period of Liability ... 31
E. Insured Time Element Option ... 33
F. Extra Expense ... 33
G. Rental Insurance ... 34
H. Time Element Coverage Extensions, Terms and Conditions ... 34

|  | 1. | Attraction Property | 34 |
|  | 2. | Commissions, Licensing Fees and Royalties | 34 |
|  | 3. | Contingent Time Element | 35 |
|  | 4. | Crisis Management | 35 |
|  | 5. | Extended Period of Liability | 36 |
|  | 6. | Impounded Water | 36 |
|  | 7. | Ingress / Egress | 36 |
|  | 8. | Interruption by Communicable Disease | 37 |
|  | 9. | Leasehold Interest | 37 |
|  | 10. | Logistics Extra Cost | 38 |
|  | 11. | Order of Civil or Military Authority | 39 |
|  | 12. | Protection and Preservation of Property – Time Element | 39 |
|  | 13. | Related Reported Values | 39 |
|  | 14. | Research and Development | 39 |
|  | 15. | Service Interruption – Time Element | 40 |
|  | 16. | Soft Costs | 41 |

**SECTION VI EXCLUSIONS** ... 42
A. Property Not Insured ... 42
B. Types of Loss or Damage Not Insured ... 43
C. Causes of Loss Not Insured ... 44
D. Time Element Exclusions ... 45

**SECTION VII VALUATION** ... 47

**SECTION VIII LOSS ADJUSTMENT AND SETTLEMENT** ... 51
A. Abandonment ... 51
B. Collection from Others ... 51
C. Company Option ... 51
D. Dispute Resolution / Optional Arbitration Provision ... 51
E. Identity of Interests ... 52
F. Loss Adjustment and Loss Payable ... 52

| | | |
|---|---|---|
| G. | Partial Payment of Loss Settlement | 52 |
| H. | Requirements in Case of Loss | 52 |
| I. | Salvage and Recovery | 53 |
| J. | Settlement of Claims | 53 |
| K. | Subrogation | 53 |
| L. | Suit | 54 |
| | SECTION IX GENERAL CONDITIONS | 55 |
| A. | Additional Insurable Interests | 55 |
| B. | Assignment of Policy | 55 |
| C. | Concealment, Misrepresentation and Fraud | 55 |
| D. | Conditions Suspending or Restricting Insurance | 55 |
| E. | Excess Insurance | 55 |
| F. | Governing Law and Jurisdiction | 55 |
| G. | Inspection of Property and Operations | 55 |
| H. | Liberalization | 56 |
| I. | Notice of Cancellation | 56 |
| J. | Occurrence Hour Clause | 56 |
| K. | Other Insurance | 56 |
| L. | Policy Modification | 57 |
| M. | Prior or Subsequent Loss | 57 |
| N. | Reduction by Loss | 57 |
| O. | Several and Not Joint Liability | 57 |
| P. | Suspension | 57 |
| Q. | Titles of Paragraphs | 57 |
| R. | Underlying Insurance | 58 |
| | SECTION X DEFINITIONS | 59 |
| A. | ACCOUNTS RECEIVABLE | 59 |
| B. | ACTUAL CASH VALUE | 59 |
| C. | COMMUNICABLE DISEASE | 59 |
| D. | CONTAMINANT(S) | 59 |
| E. | EARTH MOVEMENT | 59 |
| F. | ELECTRONIC DATA PROCESSING MEDIA | 60 |
| G. | FINE ARTS | 60 |
| H. | FINISHED GOODS | 60 |
| I. | FLOOD | 60 |
| J. | HIGH HAZARD FLOOD ZONE | 60 |
| K. | IMPROVEMENTS AND BETTERMENTS | 60 |
| L. | INSURED FIXED CHARGES | 60 |
| M. | INSURED LOCATION(S) | 60 |
| N. | INSURED'S LIABILITY | 61 |
| O. | LAND IMPROVEMENTS | 61 |
| P. | LOCATION(S) | 61 |
| Q. | MERCHANDISE | 61 |
| R. | MODERATE HAZARD FLOOD ZONE | 61 |
| S. | MONEY | 61 |
| T. | NAMED WINDSTORM | 62 |
| U. | NET PROFITS | 62 |
| V. | NEW MADRID SEISMIC ZONE: | 62 |
| W. | OCCURRENCE | 63 |
| X. | ORDINARY PAYROLL | 63 |
| Y. | PACIFIC NORTHWEST SEISMIC ZONE: | 63 |

| | | |
|---|---|---:|
| Z. | POLICY | 63 |
| AA. | PRECIOUS METALS | 63 |
| BB. | PROFITS | 64 |
| CC. | RATE OF GROSS PROFITS | 64 |
| DD. | RAW STOCK | 64 |
| EE. | SALES | 64 |
| FF. | SECURITIES | 64 |
| GG. | STANDARD SALES | 64 |
| HH. | STOCK IN PROCESS | 64 |
| II. | TIME ELEMENT | 64 |
| JJ. | CRITICAL U.S. NAMED WINDSTORM AREAS | 64 |
| KK. | VALUABLE PAPERS AND RECORDS | 66 |
| LL. | WAITING PERIOD | 66 |
| MM. | WIND | 66 |

**SECTION XI.**

Endorsements

| Form Name | Form No |
|---|---|
| Washington Amendatory Endorsement | SP 10 520 0715 |
| Additional Named Insured Interest Endorsement | SP 10 695 0815 |
| Boiler and Machinery Additional Deductible(s) and Sublimit(s) of Liability Endorsement | SP 10 700 0815 |
| Canadian List of Statutory Conditions | SP 10 702 0916 |
| Canadian Properties Endorsement | SP 10 703 0815 |
| Exclusion of Certified Acts of Terrorism | SP 10 722 0815 |
| Exclusion - Loss Due to an Act of Terrorism Endorsement | SP 10 724 0815 |
| Lenders Loss Payable Endorsement | SP 10 733 0815 |
| Miscellaneous Changes Endorsement | SP 10 741 0815 |
| Constuctive Total Loss | DR 17 689 0619 |
| Control of Damaged Goods Endorsement | DR 14 082 0517 |
| Property Not Insured Revisions | DR 14 084 0517 |
| Certificates of Insurance Endorsement | DR 14 085 0517 |

## LEADING EDGE ALL-RISK FORM
## GENERAL PROPERTY
## DOMESTIC

## SECTION I
## DECLARATIONS

All terms in unbolded capital letters throughout this POLICY are subject to the definition as set forth in this POLICY.

### A.  Issuing Company - (hereafter referred to as "the Company")

North American Elite Insurance Company
1200 Main Street, Suite 800
Kansas City, MO 64105

### B.  Policy Number

NAP 2001943-01

### C.  Insured

Space Needle, LLC and any subsidiary, and Space Needle, LLC interest in any partnership or joint venture in which Space Needle, LLC has management control, ownership, or is obligated to insure, as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the Insured, including legal representatives.

### D.  First Named Insured and Mailing Address

Space Needle, LLC
203 Sixth Avenue N
Seattle,WA 98109

### E.  Policy Period

From:   June 30, 2019

To:   June 30, 2020

### F.  Inception and Expiration Time

The time of inception and the time of expiration of this POLICY and of any schedule(s) or endorsement(s) attached shall be at 12:01 a.m. (Standard Time) at the First Named Insured's principal place of business. Notwithstanding the foregoing, it is agreed that the actual effective time of attachment of this insurance shall be the same time on the specified date as the actual effective time of cancellation or expiration of the POLICY(IES) replaced or renewed by this POLICY.

The POLICY Period ends, and coverage under this POLICY terminates, when the first of the following occurs:

1.   cancellation of this POLICY by the First Named Insured or by the Company;

2.   the replacement POLICY takes effect; or

3.    the POLICY Expiration Date.

## G.   Gross Premium

As Invoiced at Inception

## H.   Currency

Any amounts specified in this POLICY, including but not limited to premium, limit(s) of liability, deductible(s), and loss payable will be considered to be in:

US currency

## I.    Policy Territory

United States of America and its Territories and Canada.

## J.    Sanctions Clause

This POLICY will not be deemed to have provided coverage and will not be liable to pay any claim or provide any benefit to the extent that payment of such claim or provision of such benefit would expose the Company to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of any jurisdiction applicable to the Company.

## SECTION II
## POLICY LIMITS AND SUBLIMITS PURCHASED OR NOT PURCHASED

### A. Program Limit of Liability

The Insured has chosen to purchase a Property Insurance Program with a limit of $160,000,000, and this POLICY will serve to participate in that Program subject to the terms outlined in the **Company's Policy Limit of Liability and Application** section.

### B. Company's Policy Limit of Liability and Application

1. The Company is not liable for more than its proportionate share, as specified below, of the Program Limit or of the Program Layer Limits that make up the Program Limit for all loss or damage insured by this POLICY arising out of one OCCURRENCE regardless of the number of LOCATIONS or coverages involved in the OCCURRENCE.

| Company's Policy Limit of Liability | | Program Limit or Program Layer Limits | | |
|---|---|---|---|---|
| $160,000,000 | (Being 100.00 %) part of | $160,000,000 | Excess of | $0 which is excess of policy deductible |

2. The Company is not liable for more than the same proportionate share specified above of any Program Sublimit(s) which are part of the Program Limit or are part of any Program Layer Limits that make up the Program Limit.

3. The amount payable under this POLICY shall be determined by the terms of this POLICY after the application of any deductible features which may be a part of this POLICY. The **Other Insurance** provision of this POLICY is not applicable as respects other Insurers participating in the Program Limit or Program Layer Limit along with the Company's Proportionate Share.

4. In the event an OCCURRENCE results in an amount payable under more than one POLICY issued to the Insured by the Company, or its subsidiaries and affiliates, the maximum amount payable in the aggregate under all such policies will be the **Company's Policy Limit of Liability** specified herein regardless of the number of INSURED LOCATION(S) or coverages involved.

### C. Application of Program Sublimit(s)

1. Program Sublimit(s) are part of and not in addition to the Program Limit. Program Sublimit(s) do not increase the Program Limit or any other Program Sublimit(s).

2. Program Sublimit(s) apply in the aggregate per OCCURRENCE to all INSURED LOCATION(S) and for all coverages involved, including TIME ELEMENT.

3. When a Program Sublimit(s) is noted as an Annual Aggregate, such Program Sublimit(s) applies in the aggregate annually to all losses insured by this POLICY occurring during the **Policy Period**.

4. If a Program Sublimit(s) is specified for the cause of loss that causes the claimed loss or damage such sublimit is the maximum amount payable for such OCCURRENCE.

5. If a Program Sublimit(s) is specified for a coverage that is provided, such Sublimit(s) are the maximum amount payable under this POLICY for all loss or damage, resulting from physical loss or damage insured by this POLICY at such INSURED LOCATION(S).

6.     If a Program Sublimit(s) is specified for an INSURED LOCATION(S) or property, such Program Sublimit(s) is the maximum amount payable under this POLICY for all loss or damage, including TIME ELEMENT loss, at all INSURED LOCATION(S) resulting from physical loss or damage insured by this POLICY at such INSURED LOCATION(S) or to such property.

7.     This policy may contain sublimits applicable to specific locations, specific types of loss, specific causes of loss, or specific coverages. Such sublimits shall be the total payable arising out of one OCCURRENCE (or a Annual Aggregate of certain OCCURRENCES where so specified), and neither the policy limit nor any sublimits shall be increased by the application of one or more sublimits.

## D.     Coverage Purchased and Coverage Not Purchased

The following Types of Loss, Causes of Loss and Coverages are all excluded unless a monetary amount is set forth next to the Type of Loss, Cause of Loss or Coverage.  If no monetary amount is provided; the amount is $0; the line is left blank; or **NCP** (No Coverage Purchased) is shown, then those Types of Loss, Causes of Loss and those Coverages, so designated, remain excluded from recovery under this POLICY.

| Program Sublimit(s) | Type of Loss, Cause of Loss and Coverage |
|---|---|
| $10,000,000 | EARTH MOVEMENT (Annual Aggregate),further sublimited as follows: |
| $10,000,000 | EARTH MOVEMENT for LOCATIONS in the PACIFIC NORTHWEST SEISMIC ZONE (Annual Aggregate) |
| $10,000,000 | FLOOD (Annual Aggregate),further sublimited as follows: |
| $10,000,000 | FLOOD as respects HIGH HAZARD FLOOD ZONES (Annual Aggregate) |
| $10,000,000 | FLOOD as respects MODERATE HAZARD FLOOD ZONES (Annual Aggregate) |
| $160,000,000 | NAMED WINDSTORM (Annual Aggregate) ,further sublimited as follows: |
| $250,000 | **Accounts Receivable** |
| $1,000,000 | **Attraction Property** |
| $0 | **Commissions, Licensing Fees and Royalties** |
| $250,000 | **Communicable Disease Response and Interruption by Communicable Disease** combined (Annual Aggregate) |
| $2,000,000 | **Contingent Time Element** – Direct Named Suppliers and Customers |
| $2,000,000 | **Contingent Time Element** – Direct Unnamed Suppliers and Customers |
| $2,000,000 | **Contingent Time Element** – Indirect Suppliers and Customers |
| $25,000,000 | **Course of Construction** – insured property damage and TIME ELEMENT combined |
| $1,000,000 | **Crisis Management** |
| $2,000,000 | **Data Restoration** – insured property damage and TIME ELEMENT combined |
| $5,000,000 | **Debris Removal** - or 25% of the combined amount of direct physical damage and TIME ELEMENT loss payable at the LOCATION where the damage occurs or limit shown, whichever is the lesser. |
| $1,000,000 | **Defense Costs** |
| $10,000,000 | **Demolition And Increased Cost Of Construction** – insured property damage and TIME ELEMENT combined |
| $1,000,000 | **Errors and Omissions** |
| $1,000,000 | **Exhibitions, Expositions, Fairs or Trade Shows** |

| Program Sublimit(s) | Type of Loss, Cause of Loss and Coverage |
|---|---|
| $10,000,000 | **Expediting Expenses Combined with Extra Expense** |
| $10,000,000 | **Extra Expense Combined with Expediting Expenses** |
| $250,000 | Fine Arts, subject to a maximum of $250,000 per item |
| $1,000,000 | **Fire and Police Department Service Charges** |
| $36,000,000 | **Gross Earnings** |
| NCP | **Gross Profits** |
| $5,000,000 | **Ingress/Egress** |
| NCP | **Installment or Deferred Payments** |
| NCP | **Land And Water Contaminants Cleanup, Removal And Disposal** (Annual Aggregate) |
| $250,000 per OCCURRENCE <, not to exceed $10,000 per Item> | LAND IMPROVEMENTS |
| NCP | **Leasehold Interest** |
| $1,000,000 | **Logistics Extra Cost** |
| $5,000,000 | **Miscellaneous Unnamed Locations** |
| $500,000 | **Mold Ensuing from an Insured Cause of Loss** Annual Aggregate |
| $2,500,000 | **Newly Acquired Property** |
| $5,000,000 | **Order of Civil or Military Authority** |
| $250,000 | **Professional Fees:** $25,000 plus **50%** of the amount recoverable under this **Professional Fees** coverage in excess of $25,000 |
| NCP | **Radioactive Contamination** |
| $1,000,000 | **Rental Insurance** |
| $100,000 | **Research and Development** |
| $2,000,000 | **Service Interruption – Property Damage and Service Interruption – Time Element** Combined |
| $10,000,000 | **Soft Costs** |
| $0 | **Temporary Removal of Property** |
| $5,000,000 | **Transportation** - insured property damage and TIME ELEMENT combined |
| $1,000,000 | **Valuable Papers and Records** |

## E.    Time Limit(s)

No coverage is provided by this POLICY for any loss sustained or incurred beyond the corresponding Time Limit specified. Such Time Limit starts on the date of the physical loss or damage insured by this POLICY; however, not to exceed the stated dollar sublimit provided in Section D above:

120 consecutive calendar days from the date of acquisition for **Newly Acquired Property**

NCP consecutive calendar months from the date of OCCURRENCE for **Gross Profits**

30 consecutive calendar days from the date of OCCURRENCE for **Attraction Properties**

30 consecutive calendar days from the date of the order of civil or military prohibition for **Crisis Management**

365 consecutive calendar days for **Extended Period of Liability – Gross Earnings** and **Rental Insurance**

48 consecutive hours after the Insured has first taking reasonable action for **Protection and Preservation of Property – Time Element**

NCP consecutive calendar days after such length of time as would be required with the exercise of due diligence and dispatch to repair or replace the damaged dam, reservoir or equipment for **Impounded Water**

60 consecutive calendar days from the date of OCCURRENCE for **Ingress/Egress**

30 consecutive calendar days from the date of OCCURRENCE for **Logistics Extra Cost**

60 consecutive calendar days from the date of OCCURRENCE for **Order Of Civil Or Military Authority**

NCP consecutive calendar days from the date of OCCURRENCE for **Gross Profits** ORDINARY PAYROLL

12 consecutive calendar months from the date of OCCURRENCE for **Interruption By Communicable Disease**

## F. Distance Limit(s)

No coverage for TIME ELEMENT loss, as described below, is provided if the LOCATION of the physical loss or damage is beyond the stated Distance Limits indicated below:

5 statute mile(s) from the INSURED LOCATION for **Attraction Properties**

5 statute mile(s) from the INSURED LOCATION for **Ingress/Egress**

5 statute mile(s) from the INSURED LOCATION for **Order Of Civil Or Military Authority**

## G. Time Element Coverage Extensions - Application of Limits

For purposes of all claims paid hereunder in accordance with the TIME ELEMENT coverage provisions, the applicable Program Sublimits, set forth above, will be determined as though the LOCATION(S) suffering physical loss or damage insured by this POLICY were INSURED LOCATION(S), and not where the TIME ELEMENT losses might be incurred if different.

## SECTION III
## POLICY DEDUCTIBLES AND WAITING PERIODS

### A. Policy Deductibles

In each case of loss or damage insured by this POLICY, the Company is liable only if the Insured sustains such loss or damage in a single OCCURRENCE, the value of which is in excess of the applicable deductible specified, and then the amount insured by this POLICY shall be the amount in excess of the deductible, subject to all terms, conditions, provisions, limitations and exclusions of this POLICY.

Basic Deductible: $25,000 PD and 24 Hours TE

[except as respects the following:]

| EARTH MOVEMENT at LOCATIONS in the PACIFIC NORTHWEST SEISMIC ZONE | 2% of the APPLICABLE VALUES, subject to a minimum of $250,000 per OCCURRENCE | |
|---|---|---|
| EARTH MOVEMENT at all other LOCATIONS | $50,000 per OCCURRENCE | |
| FLOOD | FLOOD as respects HIGH HAZARD FLOOD ZONES | 5% of the APPLICABLE VALUES, subject to a minimum of $100,000 per OCCURRENCE Plus; |
| | FLOOD as respects MODERATE HAZARD FLOOD ZONES | 2% of the APPLICABLE VALUES, subject to a minimum of $100,000 per OCCURRENCE Plus; |
| | FLOOD at all other LOCATIONS | $100,000 per OCCURRENCE |
| Transportation | $25,000 | |
| Sewer Backup | $25,000 per OCCURRENCE | |

1. APPLICABLE VALUES as referenced in this POLICY is defined as the combined sum of:

    a. PROPERTY DAMAGE VALUES, which shall mean the 100% real and/or personal property values which are applicable at the time, date and place where direct physical loss or damage occurred subject to **Valuation** provisions of this POLICY; plus

    b. If covered TIME ELEMENT loss is claimed, the TIME ELEMENT VALUES, which shall mean the twelve (12) consecutive months values after the date of loss, that would have been earned had no loss or damage taken place, at the time, date and place of loss for 100% **Gross Earnings** (if **Gross Earnings** is claimed) or 100% **Gross Profits** (if **Gross Profits** is claimed) and/or 100% **Rental Insurance** (if **Rental Insurance** is claimed).

### B. Application of Deductibles

Unless otherwise specified above:

1. All deductibles apply per OCCURRENCE.

2.   When this POLICY insures more than one INSURED LOCATION(S), the deductible applies against the total loss and damage insured by this POLICY in any one OCCURRENCE.

3.   If two or more deductibles provided in this POLICY apply to a single OCCURRENCE, then the total to be deducted will not exceed the largest deductible applicable; provided, however, the largest deductible applicable may be comprised of two parts, one applicable to insured property damage and one applicable to TIME ELEMENT.

4.   If a deductible is expressed as a period of time which is:

   a.   not otherwise more specifically stated; or

   b.   not intended to be converted to its monetary equivalents;

   then the Company will not be liable for the amount of loss incurred or sustained by the Insured during such period of time that immediately follows the physical loss or damage insured by this POLICY.

5.   If a deductible is expressed as an Actual Daily Value (ADV) or a multiple thereof, the ADV will be calculated as follows:

   a.   Determine the **Gross Earnings** (if **Gross Earnings** is claimed) or **Gross Profits** (if **Gross Profits** is claimed) that would have been earned during the **Period of Liability** of the Insured's business had no **Time Element** loss occurred.

   b.   Divide the result in a. above by the number of working days in the **Period of Liability** of the Insured's business had no loss occurred. The resulting amount is the ADV.

   No reduction will be made for the **Gross Earnings** or **Gross Profits** not being earned in the number of working days because of the loss or damage, or because of any scheduled or unscheduled shutdowns during the **Period of Liability** of the Insured's business.

   The ADV will be calculated based on the **Gross Earnings** or **Gross Profits** of the entirety of the INSURED LOCATION(S), whether or not the loss or damage affects the entirety of the INSURED LOCATION(S). If physical loss or damage insured by this POLICY results in a TIME ELEMENT loss at more than one INSURED LOCATION(S), the ADV will be calculated based on the combined **Gross Earnings or Gross Profits** of all affected INSURED LOCATION(S).

6.   The deductibles provisions specified herein this POLICY for NAMED WINDSTORM apply to all loss or damage insured by this POLICY, caused by or arising out of a NAMED WINDSTORM, including, but not limited to, the following:

   a.   the force or action of WIND caused by or resulting from a NAMED WINDSTORM; in accordance with the FLOOD definition provision of this POLICY;

   b.   any material, object or debris that is carried, propelled or in any manner moved by a NAMED WINDSTORM;

   c.   any tornadoes that are a result of actions or effects of a NAMED WINDSTORM;

   d.   hail that is a result of actions or effects of a NAMED WINDSTORM;

   e.   lightning that is a result of actions or effects of a NAMED WINDSTORM;

   f.   rain or water, whether the rain or water is driven by WIND or not, that enters the covered building or structure through an opening created by the force of WIND or water from a NAMED WINDSTORM; or

   g.   FLOOD, if covered by this POLICY, that results from the actions or effects of NAMED WINDSTORM.

7.  The LOCATION(S) where physical loss or damage insured by this POLICY occurs shall be used to determine the deductible. Once the deductible is determined, if it is a percentage deductible, it shall be applied to the APPLICABLE VALUES.

8.  Further, for the purposes of this **Application of Deductibles** provision, with respect to **Extra Expense** and when a percent deductible applies, the **Extra Expense** deductible amount shall be combined with and determined on the same basis as was used to calculate the **Gross Earnings** or **Gross Profits**, or **Rental Insurance** deductible whether or not there is a **Gross Earnings**, or **Gross Profits**, or **Rental Insurance** loss.

## C.  Waiting Periods

Coverage is provided by this POLICY only if the corresponding WAITING PERIOD specified is exceeded. Coverage shall then apply only to the LOCATION(s) where the WAITING PERIOD has been exceeded. The corresponding coverage will then apply from the beginning of the interruption of services but only for the amounts in excess of the applicable Deductible(s). If multiple LOCATIONS exceed the WAITING PERIOD then the applicable Deductible(s) will apply to the combined loss of all such LOCATIONS.

1.  24 consecutive hours from the inception of interruption of services for **Service Interruption – Property Damage** and **Service Interruption – Time Element**.

2.  24 consecutive hours from the inception of order of prohibition for **Crisis Management**.

3.  48 consecutive hours from the inception of disruption for **Logistics Extra Cost**, except 168 consecutive hours for **Logistics Extra Cost** occasioned by EARTH MOVEMENT and/or FLOOD and/or NAMED WINDSTORM.

4.  48 consecutive hours from the date access to such INSURED LOCATION is limited, restricted or prohibited as a result of the actual not suspected presence of COMMUNICABLE DISEASE.

## LEADING EDGE ALL-RISK FORM
## GENERAL PROPERTY
## DOMESTIC

## SECTION IV
## PROPERTY DAMAGE

### A.  Insured Property

Except as excluded hereinafter, INSURED PROPERTY consists of property described below:

1.  Real property owned by the Insured or in which the Insured has an insurable interest.

2.  Personal property:

    a.  owned by the Insured, including the Insured's interest as a tenant in IMPROVEMENTS AND BETTERMENTS for which the Insured incurred the costs of installation or for which the Insured is legally liable under the terms of its lease.

    In the event of physical loss or damage insured by this POLICY to such IMPROVEMENTS AND BETTERMENTS, the Company agrees to accept and consider the Insured as sole and unconditional owner of IMPROVEMENTS AND BETTERMENTS, notwithstanding any contract or lease to the contrary.

    b.  of officers and employees of the Insured: and of others in the Insured's custody:

        I.   to the extent the Insured is under obligation to keep such property insured for physical loss or damage insured by this POLICY: or

        II.  to the extent of the INSURED'S LIABILITY for physical loss or damage insured by this POLICY to such property.

### B.  Property Damage Coverage Extensions, Terms and Conditions

The following are subject to all terms, conditions, provisions, limitations and exclusions of this POLICY and in addition, any other terms, conditions, provisions, limitations and exclusions set forth below.

1.  **Accounts Receivable**

    a.  This POLICY is extended to insure ACCOUNTS RECEIVABLE loss and expense resulting from direct physical loss or damage insured by this POLICY to the Insured's accounts receivable records, including accounts receivable records stored as ELECTRONIC DATA, while anywhere, including while in transit to the extent provided under **Transportation, within the Policy Territory.**

    b.  This extension also insures the following:

        I.   The interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as a result of such physical loss or damage.

        Unearned interest and service charges on deferred payment accounts and normal credit losses on credit extended or bad debts will be deducted in determining the recovery.

        II.  Any other necessary and reasonable costs incurred to reduce the loss, to the extent the loss is reduced.

    c.  In the event of loss to accounts receivable records, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

d.    The Insured agrees to use any suitable property or service owned or controlled by the Insured, or obtainable from other sources, in reducing the loss otherwise insured under this extension.

e.    If it is possible to reconstruct accounts receivable records so that no ACCOUNTS RECEIVABLE loss is sustained, this POLICY insures only the reasonable and necessary costs incurred for material and time required to re-establish or reconstruct such records, and not for any costs insured by any other insurance.

f.    When there is proof that a loss covered by this POLICY has occurred but the Insured cannot accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be based on the Insured's monthly statements and shall be computed as follows:

    I.    determine the amount of all outstanding accounts receivable at the end of the same fiscal month in the year immediately preceding the year in which the loss occurs;

    II.    calculate the percentage of increase or decrease in the average monthly total of accounts receivable for the twelve (12) months immediately preceding the month in which the loss occurs, or such part thereof for which the Insured has furnished monthly statements to the Company, as compared with such average for the same months of the preceding year;

    III.    the amount determined under I. above, increased or decreased by the percentage calculated under II. above, shall be the agreed total amount of accounts receivable as of the last day of the fiscal month in which said loss occurs;

    IV.    the amount determined under III. above shall be increased or decreased in conformity with the normal fluctuations in the amount of accounts receivable during the fiscal month involved, due consideration being given to the experience of the business since the last day of the last fiscal month for which a statement has been rendered.

    V.    Add any collection expenses in excess of normal collection costs and made necessary because of loss or damage, and the reasonable expenses incurred in re-establishing accounts receivable records following the loss or damage.

g.    All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company. All recoveries exceeding the amount paid by the Company will belong to the Insured.

h.    No coverage is provided under this extension for any shortage resulting from:

    I.    bookkeeping, accounting or billing errors or omissions; or

    II.    alteration, falsification, manipulation, concealment, destruction or disposal of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of MONEY, SECURITIES or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## 2.    Brands and Labels

If branded or labeled MERCHANDISE or FINISHED GOODS insured by this POLICY is damaged and the Company elects to take all or any part of such MERCHANDISE or FINISHED GOODS at the value established by the provisions of this POLICY, the Insured may, at the Company's expense, stamp "salvage" on the MERCHANDISE or FINISHED GOODS or its containers or may remove or obliterate the brands or labels, if such stamp, removal or obliteration will not physically damage or otherwise reduce the value of the MERCHANDISE or FINISHED GOODS, but the Company shall re-label the MERCHANDISE or FINISHED GOODS or containers in compliance with the requirements of law.

3. **Communicable Disease Response**

If an INSURED LOCATION owned, leased or rented by the Insured has the actual not suspected presence of COMMUNICABLE DISEASE and access to such INSURED LOCATION is limited, restricted or prohibited by:

a. an order of an authorized governmental agency regulating the actual not suspected presence of COMMUNICABLE DISEASE; or

b. a decision of an Officer of the Insured as a result of the actual not suspected presence of COMMUNICABLE DISEASE,

this POLICY covers the reasonable and necessary costs incurred by the Insured at such INSURED LOCATION with the actual not suspected presence of COMMUNICABLE DISEASE for the:

a. cleanup, removal and disposal of the actual not suspected presence of COMMUNICABLE DISEASES from INSURED PROPERTY; and

b. actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of COMMUNICABLE DISEASES on INSURED PROPERTY.

This extension of coverage will apply when access to such INSURED LOCATION is limited, restricted or prohibited in excess of the WAITING PERIOD specified for this extension.

This extension of coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of COMMUNICABLE DISEASE.

4. **Control of Damaged Property**

This POLICY gives control of physically damaged FINISHED GOODS or MERCHANDISE as follows:

a. the Insured will have full rights to the possession and control of damaged FINISHED GOODS or MERCHANDISE in the event of physical loss or damage insured by this POLICY to such FINISHED GOODS or MERCHANDISE provided proper testing is done to show which FINISHED GOODS or MERCHANDISE is physically damaged;

b. the Insured using reasonable judgment will decide if FINISHED GOODS or MERCHANDISE sustaining physical loss or damage can be reprocessed or sold;

c. FINISHED GOODS or MERCHANDISE so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent; and

d. any salvage proceeds received will go to the:

I. Company at the time of loss settlement; or

II. Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable hereunder.

e. Notwithstanding, the foregoing paragraphs a. through d., the Insured shall allow the Insurer any salvage which could be or which could have been obtained on any sale or other disposition of such goods or products through normal insurance industry salvage practices.

5. **Course of Construction**

a. This POLICY is extended to insure direct physical loss or damage insured by this POLICY to:

I.   new buildings or structures while in the course of construction, including materials and supplies intended to become a permanent part thereof located within the **Policy Territory**:

II.  machinery and equipment while in the course of installation, erection or assembly, including materials and supplies intended to become a permanent part thereof located within the **Policy Territory.**

With respect to items I. and II. of this extension, the Program Sublimit(s) specified for this extension does not apply to INSURED PROPERTY at INSURED LOCATION(S).

b.  No coverage is provided under this extension for physical loss or damage to any property:

   I.    while in transit;

   II.   while waterborne;

   III.  excluded under **Property Not Insured**; or

   IV.   in the course of assembly which is intended to become FINISHED GOODS;

### 6.   **Data Restoration**

This POLICY is extended to insure the necessary and reasonable costs and expenses actually incurred by the Insured, subject to the limits specified in the Program Sublimit(s) section, following direct physical loss or damage insured by this POLICY to INSURED PROPERTY for reproduction of ELECTRONIC DATA. Such cost of reproduction shall include all reasonable and necessary amounts, incurred by the Insured in recreating, gathering and assembling such ELECTRONIC DATA.

### 7.   **Debris Removal**

a.  This POLICY is extended to insure the necessary and reasonable costs and expenses actually incurred by the Insured, subject to the limits specified in the Program Sublimit(s) section, following direct physical loss or damage insured by this POLICY to INSURED PROPERTY, to dismantle, demolish and/or remove from INSURED LOCATION(S) the debris of INSURED PROPERTY remaining after any such physical loss or damage.

b.  No coverage is provided hereunder for costs and expenses incurred in the removal of:

   I.    any foundation, other than damaged portions which must be removed in order to effectuate the repair or rebuilding of any INSURED PROPERTY; or

   II.   any property or part thereof, the removal of which is required by the enforcement of any law, ordinance, regulation or rule regulating or restricting the construction, installation, repair, replacement, demolition, occupancy, operation or other use of INSURED PROPERTY; or

   III.  CONTAMINANTS from land or water, nor for the cost to remove, restore or replace polluted land or water.

No liability shall exist under this extension of coverage unless such costs and expenses are reported to the Company within one hundred eighty (180) days of the date of such physical loss or damage insured by this POLICY or within one hundred eighty (180) days of the expiration of this POLICY, whichever shall be earlier.

8.   **Defense Costs**

This POLICY is extended to insure the cost to defend any suit against the Insured alleging direct physical loss or damage insured by this POLICY under INSURED PROPERTY to personal property of others in the custody of the Insured while at an INSURED LOCATION to the extent of the INSURED'S LIABILITY therefore, even if such suit is groundless, false or fraudulent; but the Company may without prejudice undertake such investigation, negotiation or settlement of any such claim or suit as the Company deems expedient.

9.   **Demolition and Increased Cost of Construction**

a.    This POLICY is extended to insure the following additional costs when there is direct physical loss or damage insured by this POLICY to building(s) or structure(s) insured by this POLICY and such additional costs are occasioned by the enforcement of any law or ordinance regulating the construction, repair, replacement, use or demolition of building(s) or structure(s) which is in force at the time of loss and necessitates such costs:

   I.    cost of demolishing any undamaged portion(s);

   II.   value of the undamaged portion(s) which has been demolished subject to the same basis of recovery which applies to the damaged portion(s) of such building(s) or structure(s). This cost shall not include any greater cost of repair, replacement, construction or reconstruction due to the enforcement of any law or ordinance;

   III.  if the basis of recovery is replacement cost, the increased cost actually expended (excess of I. above) in rebuilding or replacing both the damaged and demolished portions on the same INSURED LOCATION with like height, floor area and style and for like occupancy to comply with the minimum requirements of such law or ordinance.

b.    This extension provision shall not insure:

   I.    any increase of loss associated with the enforcement of any law or ordinance which requires the Insured or others to test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of CONTAMINANTS.

   II.   any loss due to any law or ordinance with which the Insured was required to comply prior to the loss.

c.    Any Program Sublimit(s) specified for this extension does not apply to a.I. and a. II. above.

This entire provision shall not increase any amounts or limits of insurance provided by this POLICY.

10.   **Destruction by Civil or Military Authority**

This POLICY is extended to insure against acts of destruction by order of civil or military authority at the time of and for the purpose of preventing the spread of fire provided such fire originated from physical loss or damage as insured by this POLICY.

11.   **Errors and Omissions**

a.    If loss or damage is not payable under this POLICY solely due to an error or unintentional omission:

   I.    in the description of where INSURED PROPERTY is physically situated within the **Policy Territory**; or

   II.   to include any LOCATION(S), within the **Policy Territory**, that is owned, rented or leased by the Insured as of the POLICY Inception Date; or

   III.  that results in cancellation of coverage for INSURED PROPERTY under the POLICY;

then such property shall be considered INSURED PROPERTY under this POLICY to the extent it would have provided coverage had such error or unintentional omission not been made.

b.   It is a condition precedent to recovery under this extension of coverage that any error or unintentional omission be:

    I.   reported by the Insured to the Company when discovered; and

    II.   corrected upon its discovery.

## 12.   Exhibitions, Expositions, Fairs or Trade Shows

a.   The POLICY is extended to insure any personal property, except as excluded under the **Property Not Insured** section of this POLICY:

    I.   owned by the Insured:

    II.   of others in the Insured's care, custody and control:

        1)   to the extent the Insured is under an obligation to insure such property against direct physical loss or damage insured by this POLICY; or

        2)   to the extent of the INSURED'S LIABILITY for direct physical loss or damage insured by this POLICY to such property;

    while such property is situated on the premises of any exhibitions, expositions, fairs or trade shows within the **Policy Territory**.

b.   No coverage is provided under this extension for any property:

    I.   while in transit;

    II.   while waterborne;

    III.   at INSURED LOCATION(S);

    IV.   insured under **Course of Construction**;

    V.   insured under **Fine Arts**;

    VI.   that is otherwise insured by this POLICY or any other POLICY issued by the Company to the Insured.

## 13.   Expediting Expenses

This extension provision applies to real and personal property only.

a.   This POLICY is extended to insure the reasonable and necessary expenses incurred by the Insured:

    I.   to pay for the temporary repair of direct physical damage insured by this POLICY to INSURED PROPERTY at INSURED LOCATION(S); and

    II.   to expedite the permanent repair or replacement of such INSURED PROPERTY.

b.   No coverage is provided under this extension for any expenses:

    I.   recoverable under any other section or provision in this POLICY; or

    II.   for permanent repair or replacement of any INSURED PROPERTY.

14.   **Fine Arts**

    a.   This POLICY is extended to insure direct physical loss or damage insured by this POLICY to FINE ARTS while anywhere, including while in transit to the extent provided under **Transportation**, within the **Policy Territory**.

    b.   No coverage is provided under this extension for:

        I.   loss or damage if the FINE ARTS cannot be replaced with others of like kind and quality, unless such FINE ARTS are specifically declared to and accepted by the Company prior to the loss or damage; or

        II.   loss or damage caused by or resulting from or occurring during any repairing, restoration or retouching process.

15.   **Fire and Police Department Service Charges**

    a.   This POLICY is extended to insure the following reasonable and necessary charges:

        I.   fire department firefighting charges imposed on the Insured by law or ordinance as a result of responding to a fire in, on or exposing the INSURED PROPERTY at INSURED LOCATION(S);

        II.   costs incurred in restoring and recharging fire protection systems at INSURED LOCATION(S) following direct physical loss or damage insured by this POLICY to INSURED PROPERTY;

        III.   costs incurred for the water used for fighting a fire following direct physical loss or damage insured by this POLICY in, on or exposing INSURED PROPERTY at INSURED LOCATION(S);

        IV.   police department charges imposed on the Insured by law or ordinance as a result of responding to a covered cause of loss in, on or exposing the INSURED PROPERTY at INSURED LOCATION(S).

    b.   To the extent costs are incurred as insured under this extension of coverage and such costs served to prevent the occurrence of direct physical loss or damage insured by this POLICY to INSURED PROPERTY, this extension of coverage is subject to the POLICY Deductible that would have applied to any claim for such physical loss or damage insured by this POLICY that was avoided.

16.   **Installment or Deferred Payments**

This POLICY is extended to insure against direct physical loss or damage to personal property insured by this POLICY sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer. Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this POLICY for loss or damage:

    a.   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured;

    b.   from theft or conversion by the buyer of the property after the buyer has taken possession;

    c.   to the extent the buyer continues payments;

d.   to any property not within the **Policy Territory**.

17.  **Infrastructure System Coverage**

This POLICY is extended to insure direct physical loss or damage insured by this POLICY to insured personal property that is part of communications lines, data transmission lines or any infrastructure comprising or supporting the Insured's connection to its internet service provider or ELECTRONIC DATA COMMUNICATIONS SYSTEM when, and only to the extent that, such personal property is located on INSURED LOCATION(S) and is under the Insured's exclusive operational control. Insured personal property does not include satellites or ELECTRONIC DATA.

ELECTRONIC DATA COMMUNICATIONS SYSTEM, means any communication system, including computer systems and the Internet, which provides the Insured with access to other computer systems, microchips, integrated circuits or similar devices in non-computer equipment, or which provides any party access to the Insured's computer systems, microchips, integrated circuits or similar devices in non-computer equipment.

18.  **Land and Water Contaminants, Cleanup, Removal and Disposal**

a.   This POLICY is extended to insure the reasonable and necessary cost for the cleanup, removal and disposal of CONTAMINANTS:

  I.   from land; or

  II.  from water or any other substance in or on land

at INSURED LOCATION(S) provided the release, discharge or dispersal of such CONTAMINANTS is directly caused by direct physical loss or damage insured by this POLICY to INSURED PROPERTY at INSURED LOCATION(S).

b.   No coverage is provided under this extension of coverage for the cost:

  I.   to test for, monitor or assess the existence, concentration or effects of any CONTAMINANTS, other than the testing which is performed in the course of extracting the CONTAMINANTS;

  II.  to cleanup, remove and dispose of any CONTAMINANTS from land, or from water or any other substance in or on land:

    1)   at INSURED LOCATION(S) for which coverage is not provided hereunder for real property.

    2)   if the Insured fails to give written notice of loss to the Company within one hundred eighty (180) consecutive calendar days from the date of such physical loss or damage causing the release, discharge or dispersal of such CONTAMINANTS.

19.  **Miscellaneous Unnamed Locations**

This POLICY is extended to insure INSURED PROPERTY within the **Policy Territory** that is either:

a.   not listed on the latest Schedule of Locations submitted to, accepted by and on file with the Company; or

b.   listed on the latest Schedule of Locations submitted to, accepted by and on file with the Company but for which the Insured has not submitted values for its interest.

20. **Newly Acquired Property**

   a. This POLICY is extended to insure direct physical loss or damage insured by this POLICY to newly constructed real property upon completion, or real property acquired or leased within the **Policy Territory** during the term of this POLICY and personal property, while under the care, custody and control of the Insured at any such new LOCATION(S). TIME ELEMENT coverage is provided for property insured under this extension of coverage, subject to all TIME ELEMENT terms, conditions, provisions, limitations and exclusions.

   b. Coverage under this **Newly Acquired Property** provision shall commence when the Insured first acquires an insurable interest at the new LOCATION(S) and shall cease after the number of days specified in the **Time Limit** section if not reported to and accepted by the Company. If reported to and accepted by the Company the coverage provided by this POLICY for that LOCATION shall be the same as for all other INSURED LOCATION(S) unless otherwise specified herein or by endorsement.

   c. No coverage is provided under this coverage extension for property while in transit or waterborne, nor while on the premises of any exhibition, exposition, fair or trade show. This provision shall not be construed as providing coverage at LOCATION(S) scheduled or otherwise insured herein.

   d. This **Newly Acquired Property** provision shall not increase any amounts or limits of insurance provided by this POLICY.

21. **On Site Construction**

   This POLICY is extended to insure direct physical loss or damage insured by this POLICY to buildings and structures undergoing construction, alteration, extension, or renovation while taking place on INSURED LOCATION(S). TIME ELEMENT coverage is provided for property insured under this extension of coverage, subject to all TIME ELEMENT terms, conditions, provisions, limitations and exclusions.

22. **On Site Service Interruption**

   This POLICY is extended to insure direct physical loss or damage insured by this POLICY, including shrinkage, evaporation, leakage of contents, change in flavor or texture or finish, decay or other spoilage, when such physical loss or damage is the result of an interruption of services caused by physical loss or damage as insured against by this POLICY, at INSURED LOCATION(S).

   The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

23. **Professional Fees**

   a. This POLICY is extended to insure the reasonable expenses, including the cost of using the Insured's employees, incurred by the Insured, or by the Insured's representatives, including but not limited to accountants, appraisers, auditors, consultants, or other such professionals, for preparing and certifying the details of a claim insured by this POLICY.

   b. No coverage is provided under this extension of coverage for expenses incurred by the Insured in utilizing or retaining the services of:

   I. attorneys;

   II. independent or public adjusters;

   III. any subsidiary, related or associated entities either wholly or partially owned by an attorney or public adjuster; or

   IV. any entity, hired by or on behalf of the Insured, for the purpose of advocacy.

24. **Protection and Preservation of Property – Property Damage**

   a.   This Policy is extended to insure reasonable and necessary costs incurred for actions to temporarily protect or preserve INSURED PROPERTY; provided such actions are necessary due to actual, or to prevent immediately impending, direct physical loss or damage insured by this POLICY to such INSURED PROPERTY.

   b.   This extension is subject to the deductible and sublimit provisions that would have applied had the physical loss or damage happened.

25. **Radioactive Contamination**

   Notwithstanding any Nuclear Exclusion clause contained herein, this POLICY is extended to insure direct physical loss or damage insured by this POLICY to INSURED PROPERTY caused by sudden and accidental radioactive contamination, including resultant radiation damage to INSURED PROPERTY provided:

   a.   such radioactive contamination is caused by the release of radiation from radioactive material which is commonly known to be radioactive and commonly located on an INSURED LOCATION(S);

   b.   such radioactive material knowingly is kept on an INSURED LOCATION(S) and its radioactivity is used for the purpose of the Insured's operations; and

   c.   at the time of such sudden and accidental contamination, there is neither a nuclear reactor capable of sustaining nuclear fission in a self-supporting chain reaction, nor any new or used nuclear fuel which is intended for or which has been used in a nuclear reactor, on the INSURED LOCATION(S).

26. **Service Interruption – Property Damage**

   a.   This POLICY is extended to insure direct physical loss or damage insured by this POLICY including shrinkage, evaporation, leakage of contents, change in flavor or texture or finish, decay or other spoilage to INSURED PROPERTY at INSURED LOCATION(S) when such physical loss or damage results from the interruption of services consisting of:

   I.      incoming electricity;

   II.     incoming fuel;

   III.    incoming gas;

   IV.     incoming refrigerant;

   V.      incoming steam;

   VI.     incoming water;

   VII.    outgoing sewerage service; or

   VIII.   incoming or outgoing audio, voice and video;

   b.   This extension of coverage applies only when such interruption of service is caused by physical loss or damage resulting from a cause of loss insured by this POLICY to any property of the type insured by this POLICY of the supplier of such services if such property is situated within the **Policy Territory** commencing when such service is interrupted and ceasing when with due diligence and dispatch such services have been or could have been restored.

   c.   The Insured agrees to immediately notify the suppliers of services of any interruption of such services.

   d.   No coverage is provided under this extension of coverage:

I.    unless the period of service interruption exceeds the WAITING PERIOD specified for this extension; or

II.   if the interruption of such services is caused by the failure of the Insured to comply with the terms and conditions of any terms or contracts the Insured has for the supply of such services; or

III.  for loss sustained at any **Miscellaneous Unnamed Location**.

### 27.  **Temporary Removal of Property**

When INSURED PROPERTY is removed from an INSURED LOCATION for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage insured by this POLICY, this POLICY insures such property:

a.    while at the premises to which such property has been moved; and

b.    for physical loss or damage insured by this POLICY at the INSURED LOCATION from which such property was removed.

This additional coverage does not apply to property:

a.    insured, in whole or in part, elsewhere in this POLICY.

b.    insured, in whole or in part, by any other insurance policy.

c.    removed for normal storage, processing or preparation for sale or delivery.

### 28.  **Transportation**

a.    This POLICY is extended to insure the following personal property, except as excluded under **Property Not Insured**, while in transit within the **Policy Territory**:

    I.    personal property owned by the Insured;

    II.   personal property shipped to customers under F.O.B., C & F or similar terms. The Insured's contingent interest in such shipments is admitted;

    III.  personal property of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or INSURED'S LIABILITY;

    IV.   personal property of others sold by the Insured, that the Insured has agreed prior to the loss to insure during the course of delivery.

b.    No coverage is provided under this extension for:

    I.    samples in the custody of salespeople or selling agents;

    II.   any property insured under import or export ocean marine insurance;

    III.  waterborne shipments, except while on the navigable inland waters and coastwise shipments within the **Policy Territory**;

    IV.   airborne shipments unless by regularly-scheduled passenger airlines or air freight carriers;

    V.    property of others, including the INSURED'S LIABILITY for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier;

    VI.   the conveyance used as the mode of transportation (including any part of equipment thereof) or containers;

VII. all materials in transit which are otherwise insured under another policy of insurance; or

VIII. any property insured under **Miscellaneous Unnamed Locations**.

c. Coverage attachment and duration:

    I. Coverage provided under this extension of coverage starts from the time the property leaves the original point of shipment for transit. It then insures continuously in the due course of transit within the continent in which the shipment commences until the property arrives at the destination within such continent subject to the terms and conditions set forth in a and b of this extension of coverage;

    II. However, coverage on export shipments not insured under ocean cargo policies ends when such personal property is loaded onboard overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies starts after discharge from overseas vessels or aircraft;

    III. This insurance only covers such shipments, the transportation of which begins within the term of this POLICY, even though said transportation is not completed prior to POLICY expiration.

d. This extension of coverage also insures:

    I. general average and salvage charges on shipments insured while waterborne;

    II. physical loss or damage to such personal property caused by or resulting from:

        1) unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts;

        2) improper parties having gained possession of property through fraud or deceit.

e. Additional general provisions:

    I. This extension will not inure to the benefit of any carrier or bailee;

    II. The Insured has permission, without prejudicing this insurance, to accept:

        1) ordinary bills of lading used by carriers;

        2) released bills of lading;

        3) undervalued bills of lading; and

        4) shipping or messenger receipts.

f. The Insured may waive subrogation against railroads under side track agreements.

g. Except as otherwise stated, the Insured agrees not to enter into any special agreement with carriers releasing them from their common law or statutory liability.

### 29. **Vacancy**

a. This POLICY insures:

    I. vacant or unoccupied buildings, including INSURED PROPERTY therein, at INSURED LOCATION(S); or

    II. INSURED PROPERTY at INSURED LOCATION(S) where the Insured has ceased operations.

b. All subject to and provided that:

I. existing fire protection, watch and alarm services at such INSURED LOCATION(S) are maintained; and

II. written notice is given to the Company prior to the 120th consecutive calendar day of cessation of operations, vacancy or unoccupancy.

c. For purposes of this extension, the buildings at an INSURED LOCATION(S) are considered vacant or unoccupied when they do not contain sufficient property and personnel to conduct customary business operations.

d. This extension excludes coverage from loss due to theft, vandalism or malicious mischief.

## 30.   Valuable Papers and Records

a. This POLICY insures direct physical loss or damage insured by this POLICY to VALUABLE PAPERS AND RECORDS while anywhere, including while in transit to the extent provided under **Transportation**, within the **Policy Territory**.

b. No coverage is provided under this extension of coverage for:

I. loss or damage to VALUABLE PAPERS AND RECORDS if such property cannot be replaced with others of like kind and quality, unless specifically declared to and accepted by the Company prior to the loss or damage;

II. loss or damage to property held as samples or for sale or for delivery after sale;

III. errors or omissions in processing or copying unless physical loss or damage insured by this POLICY to VALUABLE PAPERS AND RECORDS results, in which event, only such resulting physical loss or damage is insured under this extension of coverage;

IV. loss or damage to VALUABLE PAPERS AND RECORDS caused by or resulting from deterioration, inherent vice, vermin or wear and tear; all unless physical loss or damage insured by this POLICY to VALUABLE PAPERS AND RECORDS results, in which event, only such resulting physical loss or damage is insured under this extension.

## SECTION V
## TIME ELEMENT

### A. Loss Insured

1. This POLICY insures TIME ELEMENT loss, during the **Period of Liability** directly resulting from direct physical loss or damage insured by this POLICY to INSURED PROPERTY at INSURED LOCATION(S) or as otherwise provided in this section or endorsed hereon, and subject to all terms and conditions within this POLICY.

2. This POLICY insures TIME ELEMENT loss only to the extent it cannot be reduced through:

   a. the use of any property or service owned or controlled by the Insured;

   b. the use of any property or service obtainable from other sources;

   c. working extra time or overtime; or

   d. the use of inventory.

3. The Company shall take into consideration the combined operating results of all INSURED LOCATION(S) and associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

4. This POLICY insures expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section. The amount of such recoverable expenses will not exceed the amount by which the loss otherwise payable hereunder is reduced.

5. The Insured agrees to:

   a. act with due diligence and dispatch in repairing or replacing physically damaged buildings and equipment to the same or equivalent physical and operating conditions that existed immediately prior to such physical loss or damage; and

   b. take whatever actions are necessary and reasonable to minimize the loss payable hereunder.

6. In determining the amount of loss payable, the Company will consider:

   a. the experience of the business before and after; and

   b. the probable experience during

   the **Period of Liability**.

7. There will be no recovery of loss under this **Time Element** section of this POLICY when there is recovery elsewhere in this POLICY.

### B. Gross Earnings

1. The recoverable **Gross Earnings** loss is the Actual Loss Sustained by the Insured due to the necessary interruption of the Insured's business during the **Period of Liability** as respects **Gross Earnings** less all charges and expenses that do not, or did not necessarily, continue during such interruption.

2. In determining the indemnity payable as the Actual Loss Sustained by the Insured, the Company will consider the continuation of only those normal charges and expenses that would have been incurred had no interruption of the Insured's business occurred.

3. There is recovery herein but only to the extent that the Insured is:

    a.    wholly or partially prevented from producing goods or continuing business operations or services;

    b.    unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

    c.    unable to continue its operations or services during the **Period of Liability**; and

    d.    able to demonstrate a loss of SALES resulting from an interruption in operations, services or production.

4.    For the purpose of this insurance, **Gross Earnings** are defined as the sum of:

    a.    As respects:

        I.    manufacturing operations, the net SALES value of production less the cost of all RAW STOCK, materials and supplies used in such production; or

        II.    mercantile or non-manufacturing operations, the total net SALES less cost of MERCHANDISE sold, materials and supplies consumed in the operations or services rendered by the Insured; and

    b.    all other earnings derived from the operation of the business.

Any amount recovered at selling price for physical loss or damage to FINISHED GOODS or MERCHANDISE, which has been valued at the selling price, will be considered to have been sold to the Insured's regular customers and will be credited against claimed loss of net SALES.

## C.   Gross Profits

1.    The recoverable **Gross Profits** loss is the Actual Loss Sustained by the Insured due to the necessary interruption of the Insured's business during the **Period of Liability** as respects the following:

    a.    Reduction In SALES:

        I.    The sum produced by applying the RATE OF GROSS PROFITS to the amount by which the SALES during the **Period of Liability** fall short of the STANDARD SALES.

        II.    In determining the Reduction in SALES, any amount recovered under the **Property Damage** section for physical loss or damage to FINISHED GOODS or MERCHANDISE which has been valued at the selling price will be considered to have been sold to the Insured's regular customers and will be credited against lost SALES.

        III.    all less any sum saved during the **Period of Liability** with respect to INSURED FIXED CHARGES as may cease or be reduced because of such interruption.

    b.    Increase In Cost Of Doing Business:

    The additional expenditure necessarily and reasonably incurred by the Insured for the sole purpose of avoiding or diminishing the Reduction in SALES which, but for that expenditure, would have taken place during the **Period of Liability**; but not exceeding the sum produced by applying the RATE OF GROSS PROFITS to the amount of the reduction thereby avoided; all less any sum saved during the **Period of Liability** with respect to INSURED FIXED CHARGES as may cease or be reduced because of such interruption.

2.    In determining the indemnity payable as the Actual Loss Sustained by the Insured:

a.  If any fixed charges of the business are not insured herein, then in computing the loss payable hereunder as Increase In Cost Of Doing Business, that proportion only of the additional expenditure will be recoverable herein which the sum of the NET PROFITS and the INSURED FIXED CHARGES bears to the sum of the NET PROFITS and all the fixed charges.

b.  If, during the **Period of Liability**, goods are sold or services are rendered at LOCATION(S) other than INSURED LOCATION(S) for the benefit of the Insured's business either by the Insured or by others on the Insured's behalf, the MONEY paid or payable in respect of such SALES or services will be included in arriving at the amount of SALES during the **Period of Liability**.

3.  Coverage provided herein for the Reduction in SALES due to contract cancellation or lost business opportunity is limited only to those SALES that would have been earned under the contract during the **Period of Liability**.

## D.  Period of Liability

1.  The **Period of Liability** applying to all TIME ELEMENT coverages, except **Gross Profits** and **Leasehold Interest** and as shown below, or if otherwise provided under the TIME ELEMENT coverage extensions, is as follows:

   a.  For building and equipment, the period of time:

      I.   starting on the date of physical loss or damage insured by this POLICY to INSURED PROPERTY; and

      II.  ending when with due diligence and dispatch the building and equipment could be repaired or replaced with current materials of like size, kind and quality and made ready for operations;

      under the same or equivalent physical and operating conditions that existed immediately prior to such physical loss or damage.

      Such period of time is not limited by the POLICY expiration date.

   b.  For property insured under **Course of Construction**, the equivalent of the period of time in a. above will be applied to the level of business that would have been reasonably achieved after the construction, alteration, extension, renovation, installation, erection, or assembly that would have been completed had no physical loss or damage insured by this POLICY occurred.

      Due consideration will be given to the actual experience of the business compiled after completion of the construction, alteration, extension, renovation, installation, erection, or assembly.

   c.  For STOCK IN PROCESS and MERCHANDISE, including finished goods not manufactured by the Insured, the period of time required with the exercise of due diligence and dispatch:

      I.   to restore STOCK IN PROCESS to the same state of manufacture in which it existed at the inception of the interruption of the Insured's business; and

      II.  to replace physically damaged MERCHANDISE.

   d.  For raw materials and supplies, the period of time:

      I.   of the actual interruption of the Insured's business resulting from the Insured's inability to obtain suitable raw materials and supplies similar to those damaged; but

      II.  limited to that period of time for which the damaged raw materials and supplies would have supplied operating needs.

    e.    For physical loss or damage to ELECTRONIC DATA PROCESSING MEDIA, the period of time required to copy from backups or from originals of a previous generation. Such period of time shall include all reasonable and necessary time, incurred by the Insured in recreating, gathering and assembling such ELECTRONIC DATA.

    f.    For physical loss or damage to exposed films, records, manuscripts and drawings, the period of time required to copy from backups or from originals of a previous generation. Such period of time shall include all reasonable and necessary time, incurred by the Insured in recreating, gathering and assembling such ELECTRONIC DATA.

    g.    The **Period of Liability** applying to **Rental Insurance** is as follows:

        I.    The period of time:

            1)    starting on the date of physical loss or damage insured by this POLICY to INSURED PROPERTY; and

            2)    ending when with due diligence and dispatch the building and equipment could be repaired, rebuilt or replaced with current materials of like size, kind and quality and made ready for operations;

        under the same or equivalent physical and operating conditions that existed immediately prior to such physical loss or damage.

        Or,

        II.    The period of time:

            1)    starting on the date of physical loss or damage insured by this POLICY to INSURED PROPERTY; and

            2)    ending no later than the number of months equivalent to the declared rental values listed on the Schedule of Locations submitted to, accepted by and on file with the Company;

2.    The **Period of Liability** applying to **Gross Profits** is as follows:

    a.    The period of time:

        I.    starting on the date of physical loss or damage insured by this POLICY to INSURED PROPERTY; and

        II.    ending no later than the Time Limit specified for **Gross Profits**;

    during which period the results of the business are directly affected by such physical loss or damage.

    Such period of time is not limited by the POLICY expiration date.

    b.    For property insured under **Course of Construction**, the period:

        I.    starting on the date that the Insured's business would have commenced if physical loss or damage insured by this POLICY had not occurred; and

        II.    ending no later than the Time Limit specified for **Gross Profits**;

    during which period the results of the business are directly affected by such damage.

    Such period of time is not limited by the POLICY expiration date.

The RATE OF GROSS PROFITS and STANDARD SALES are based on the experience of the business after the completion of construction, alteration, extension, renovation, installation, erection, or assembly and on the probable experience during the **Period of Liability**.

3.  The **Period of Liability** does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

    a.  making changes to the equipment;

    b.  making changes to the buildings or structures, except as provided under **Demolition and Increased Cost of Construction**;

    c.  re-staffing or re-training employees. However, this item **c.** does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is completed within 90 consecutive days after the new machinery or equipment has been installed.

4.  If more than one **Period of Liability** applies, such periods will not be cumulative.

## E.  Insured Time Element Option

1.  The Insured has the option to make claim based on either:

    a.  **Gross Earnings** and **Extended Period of Liability**; or

    b.  **Gross Profits**,

    c.  As respects **Rental Insurance** and **Extended Period of Liability** applying to **Rental Insurance**, the Insured additionally has the option to make a **Rental Insurance** claim based on the options as described within the **Period of Liability** clause of this POLICY,

    as described in the **Time Element** section of this POLICY and subject to the applicable terms and conditions as may be shown elsewhere.

    Such option may be exercised at any time prior to the conditions set forth in the **Settlement of Claims** clause in the **Loss Adjustment and Settlement** section of this POLICY. If such claim involves more than one INSURED LOCATION(S), including interdependency at one or more INSURED LOCATIONS, such claim will be adjusted by using the single coverage option chosen above.

## F.  Extra Expense

1.  The recoverable **Extra Expense** loss is the reasonable and necessary extra costs incurred by the Insured during the **Period of Liability** as respects the following:

    a.  extra costs to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and

    b.  extra costs of temporarily using property or facilities of the Insured or of others;

    c.  costs to purchase FINISHED GOODS from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's FINISHED GOODS, less payment received for the sale of such FINISHED GOODS;

    d.  less any value remaining at the end of the **Period of Liability** for any property obtained in connection with the above.

    **Time Element Exclusion** paragraph **D.3.** does not apply to paragraph **c.** above.

2. No coverage is provided herein for:

   a. any loss of income;

   b. costs that normally would have been incurred in conducting the Insured's business during the same period had no physical loss or damage insured by this POLICY to INSURED PROPERTY occurred;

   c. cost of permanent repair or replacement of any property that has sustained physical loss or damage; or

   d. any expense recoverable elsewhere in this POLICY.

## G. Rental Insurance

1. The recoverable **Rental Insurance** loss is the Actual Loss Sustained by the Insured during the **Period of Liability** as respects:

   a. the fair rental value of any portion of an INSURED LOCATION(S) occupied by the Insured that the Insured is unable to occupy following physical loss or damage insured by this POLICY;

   b. the income reasonably expected from rentals of unoccupied or unrented portions of INSURED LOCATION(S) available for rent at the time of physical loss or damage insured by this POLICY; and

   c. the rental income from the rented portions of INSURED LOCATION(S) according to bona fide leases, contracts or agreements in force at the time of physical loss or damage insured by this POLICY to such real property;

   all not to include non-continuing charges and expenses.

2. No coverage is provided herein for any loss of rental income during any period in which INSURED PROPERTY would not have been tenantable for any reason other than physical loss or damage insured by this POLICY, except as otherwise provided under **Extended Period of Liability**.

## H. Time Element Coverage Extensions, Terms and Conditions

The following are subject to all terms, conditions, provisions, limitations and exclusions of this POLICY and in addition, any other terms, conditions, provisions, limitations and exclusions set forth below.

1. **Attraction Property**

   This POLICY is extended to insure loss of **Gross Earnings**, **Gross Profits**, **Rental Insurance**, and **Extra Expense** incurred by the Insured directly resulting from direct physical loss or damage as insured by this POLICY to property of the type insured, but not owned or operated by the Insured, that directly attracts business to an INSURED LOCATION(S).

2. **Commissions, Licensing Fees and Royalties**

   a. The recoverable **Commissions, Licensing Fees and Royalties** loss is **Gross Earnings** or **Gross Profits** loss incurred by the Insured during the **Period of Liability** less any non-continuing expenses and charges.

   b. The recoverable **Commissions, Licensing Fees and Royalties** loss incurred is **Gross Earnings** or **Gross Profits** lost by the Insured during the **Period of Liability** under any royalty, licensing fee, franchise fee or commission agreements between the Insured and another party which is not realizable due to direct physical loss or damage insured by this POLICY to any property, except of the type excluded under **Property Not Insured**, of the other party at any LOCATION(S) situated within the **Policy Territory**.

  c. The Insured agrees to influence, to the extent possible, the other party with whom the agreements described above have been made to use any other machinery, supplies or LOCATION(S) in order to resume business so as to reduce the amount of loss payable hereunder, and the Insured agrees to cooperate with that party in every way to effect this.

  d. No coverage is provided hereunder for any costs to effect the above unless authorized in advance by the Company.

  e. In determining the amount of loss payable hereunder, the Company will consider the amount of income derived from such agreements before and the probable amount of income after the date of such physical loss or damage had no loss occurred.

  f. Recovery is available hereunder only if such physical loss or damage interrupts the delivery of goods in whole or in part to the Insured or for the Insured's account.

### 3. Contingent Time Element

  a. This POLICY is extended to insure loss of **Gross Earnings, Gross Profits, Rental Insurance**, and **Extra Expense** incurred by the Insured during the **Period of Liability** directly resulting from direct physical loss or damage insured by this POLICY to any property, except of the type as excluded under **Property Not Insured**, at any LOCATION(S) of suppliers or customers, provided that such physical loss or damage prevents:

    I. such suppliers from supplying goods or services directly or indirectly to the Insured;

    II. such customers from receiving goods or services directly or indirectly from the Insured;

  provided that such LOCATION(S) of suppliers or customers are situated within the **Policy Territory.**

  b. Specified limits for this extension are shown in the **Coverage Purchased and Coverage Not Purchased** section of this POLICY for:

    I. those direct suppliers and customers who have been specifically named by the Insured have been submitted to, accepted by and on file with the Company;

    II. those direct suppliers and customers who have not been specifically named by the Insured; and

    III. all indirect suppliers and customers.

  c. As used herein, suppliers or customers do not include any company supplying to or receiving from INSURED LOCATION(S) electricity, fuel, gas, refrigerant, sewage, steam, water, telecommunications, audio, data or video.

### 4. Crisis Management

  a. This POLICY is extended to insure loss of **Gross Earnings, Gross Profits, Rental Insurance**, and **Extra Expense** incurred by the Insured during the **Period of Liability** if an order of civil or military authority prohibits access to an INSURED LOCATION(S), provided such order is a direct result of:

    I. a violent crime, suicide, attempted suicide, or armed robbery; or

    II. a death or bodily injury caused by a workplace accident;

  at such INSURED LOCATION(S).

b. For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the **Period Of Liability** is in excess of the WAITING PERIOD specified for this extension.

The **Period Of Liability** for this **Time Element Coverage Extension** will be:

The period of time:

a. starting with the time the civil or military authority prohibits partial or total access; but

b. not to exceed the Time Limit specified for **Crisis Management**.

### 5. Extended Period of Liability

a. The coverage provided hereunder for loss of **Gross Earnings** and **Rental Insurance** (solely as respects **Period of Liability** option "I." applying to **Rental Insurance**) is extended to insure for only up to the additional length of time shown for **Extended Period of Liability** in the **Coverage Purchased and Coverage Not Purchased** section as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no physical loss or damage insured by this POLICY occurred;

b. The Time Limit for this extension of coverage starts on the date the applicable **Period of Liability** ends.

### 6. Impounded Water

a. This POLICY is extended to insure loss of **Gross Earnings**, **Gross Profits**, **Rental Insurance**, and **Extra Expense** incurred by the Insured due to the necessary interruption of the Insured's business caused by inadequate water supply.

b. It is a condition precedent to recovery under this extension that such inadequate water supply is a direct result of the release of water:

I. stored behind dams or in reservoirs; and

II. at INSURED LOCATION(S); and

III. used for any manufacturing purpose, including but not limited to as raw material or for power production; and

IV. caused by direct physical loss or damage insured by this POLICY to such dams or reservoirs, or to equipment connected thereto.

### 7. Ingress / Egress

This POLICY is extended to insure loss of **Gross Earnings**, **Gross Profits**, **Rental Insurance**, and **Extra Expense** incurred by the Insured due to the necessary interruption of the Insured's business, provided that:

a. the interruption directly results from the prevention of direct ingress to or direct egress from INSURED LOCATION(S), whether or not INSURED PROPERTY at such INSURED LOCATION(S) is damaged; and

b. the prevention above is caused by direct physical loss or damage as insured by this POLICY to any property, including property excluded under **Property Not Insured**.

8.  **Interruption by Communicable Disease**

If an INSURED LOCATION owned, leased or rented by the Insured has the actual not suspected presence of COMMUNICABLE DISEASE and access to such INSURED LOCATION is limited, restricted or prohibited by:

a.  an order of an authorized governmental agency regulating the actual not suspected presence of COMMUNICABLE DISEASE; or

b.  a decision of an Officer of the Insured as a result of the actual not suspected presence of COMMUNICABLE DISEASE,

this POLICY is extended to insure loss of **Gross Earnings**, **Gross Profits**, **Rental Insurance**, and **Extra Expense** incurred by the Insured during the **Period Of Liability** at such INSURED LOCATION with the actual not suspected presence of COMMUNICABLE DISEASE.

This extension of coverage will apply when access to such INSURED LOCATION is limited, restricted, or prohibited in excess of the WAITING PERIOD specified for this extension.

**Interruption By Communicable Disease** Exclusions: As respects **Interruption By Communicable Disease**, the following additional exclusions apply:

This POLICY does not insure loss resulting from the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of COMMUNICABLE DISEASE.

The **Period Of Liability** for this **Time Element Coverage Extension** will be:

The period of time:

a.  starting at the time of the order of the authorized governmental agency or the Officer of the Insured; but

b.  not to exceed the Time Limit specified for **Interruption by Communicable Disease**,

this period of time is part of and not in addition to any **Period Of Liability** applying to any coverage provided in the **Time Element** section.

9.  **Leasehold Interest**

a.  This POLICY is extended to insure **Leasehold Interest** loss is as follows:

In the event of direct physical loss or damage insured by this POLICY to INSURED LOCATION(S) at which the Insured leases space and pursuant to a written lease, if the lease agreement requires continuation of rent and if the property is wholly untenantable or unusable due to such physical loss or damage:

I.  the actual rent payable for the unexpired term of the lease; or,

II.  if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease; or,

III.  If the lease is canceled by the lessor pursuant to the lease agreement or by the operation of law:

1)  the LEASE INTEREST for the first three (3) consecutive calendar months following the physical loss or damage; and

2)  the NET LEASE INTEREST for the remaining unexpired term of the lease.

LEASE INTEREST means the excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

NET LEASE INTEREST means the present value amount, which placed at the prime rate of annual interest effective on the date of physical loss or damage, as published in the Wall Street Journal, would equal the LEASE INTEREST (less any amounts otherwise payable hereunder).

b.   No coverage is provided for any increase in loss resulting from:

  I.     the suspension, cancellation or lapse of any license;

  II.    the Insured exercising an option to extend, renew or cancel the lease;

  III.   any act or omission of the Insured that constitutes a default under the lease;

  IV.    the Insured's loss of **Leasehold Interest** resulting from physical loss or damage to personal property.

10.   **Logistics Extra Cost**

  a.   This POLICY is extended to insure the extra cost incurred by the Insured during the **Period of Liability** due to the disruption of the normal movement of goods or materials:

    I.    directly between INSURED LOCATIONS; or

    II.   directly between an INSURED LOCATION(S) and a LOCATION(S) of a direct customer, direct supplier, direct contract manufacturer, or direct contract service provider to the Insured,

    provided that such disruption is a direct result of direct physical loss or damage insured by this POLICY to property of the type insured hereunder located within the **Policy Territory** of this POLICY.

  b.   The amount recoverable hereunder will be the reasonable and necessary extra costs incurred by the Insured to temporarily continue as nearly normal as practicable the movement of goods or materials.

  c.   This extension does not insure:

    I.     any loss resulting from disruption in the movement of goods or materials between **Contingent Time Element** LOCATIONS;

    II.    any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage, telecommunications, and voice, data or video;

    III.   any loss of income;

    IV.    costs that usually would have been incurred in conducting the business during the same period had there been no disruption of normal movement of goods or materials;

    V.     costs of permanent repair or replacement of property that has been damaged or destroyed;

    VI.    any expense recoverable elsewhere in this POLICY;

    VII.   any loss resulting from disruption caused by loss or damage from EARTH MOVEMENT in California, in the NEW MADRID SEISMIC ZONE or in the PACIFIC NORTHWEST SEISMIC ZONE;

    VIII.  any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

    d.    Notwithstanding the **Period of Liability** definition in the **Time Element** section, for this TIME ELEMENT coverage extension the **Period of Liability** will

        I.    start at the time of physical loss or damage causing the disruption of the normal movement of goods or materials directly between INSURED LOCATIONS; or directly between the INSURED LOCATION(S) and the LOCATION(S) of the direct customer, direct supplier, direct contract manufacturer or direct contract service provider to the Insured; and

        II.    end not later than when with due diligence and dispatch the normal movement of goods or materials directly between INSURED LOCATIONS; or directly between the INSURED LOCATION(S) and the LOCATION(S) of the direct customer, direct supplier, direct contract manufacturer or direct contract service provider to the Insured could be resumed.

11.    **Order of Civil or Military Authority**

This POLICY is extended to insure loss of **Gross Earnings**, **Gross Profits**, **Rental Insurance**, and **Extra Expense** incurred by the Insured due to the necessary interruption of the Insured's business, provided that:

    a.    the interruption directly results from an order of a civil or military authority that prohibits partial or total access to INSURED LOCATION(S); and

    b.    the order referenced above is caused by direct physical loss or damage as insured by this POLICY to property, including property excluded under **Property Not Insured**.

12.    **Protection and Preservation of Property – Time Element**

    a.    This POLICY is extended to insure loss of **Gross Earnings, Gross Profits, Rental Insurance**, and **Extra Expense** incurred by the Insured for a period of time after the Insured has first taken reasonable action for the temporary protection and preservation of property insured by this **POLICY** provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this **POLICY** to such INSURED PROPERTY.

    b.    This extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

13.    **Related Reported Values**

If:

    a.    reported TIME ELEMENT values include values for LOCATION(S) used by the Insured (such as branch stores, SALES outlets and other plants) but such LOCATION(S) are not listed on the latest schedule submitted to, accepted by and on file with the Company; and

    b.    a TIME ELEMENT loss results at such LOCATION(S) due to direct physical loss or damage insured by this POLICY to INSURED PROPERTY at INSURED LOCATION(S);

then this POLICY is extended to insure such resulting TIME ELEMENT loss in accordance with the coverage applicable at the INSURED LOCATION(S) where such physical loss or damage occurred.

14.    **Research and Development**

    a.    This POLICY is extended to insure the Actual Loss Sustained consisting only of:

        I.    agreed continuing INSURED FIXED CHARGES; and

        II.    ORDINARY PAYROLL.

directly attributable to the necessary interruption of the Insured's research and development activities that in themselves would not have produced income during the **Period of Liability**, but only to the extent that such continuing INSURED FIXED CHARGES and ORDINARY PAYROLL are incurred without **Research and Development** activity taking place nor having been made up at any time. Such interruption must result from direct physical loss or damage insured by this POLICY to INSURED PROPERTY at INSURED LOCATION(S).

b. Notwithstanding the **Period of Liability** definition in the **Time Element** section, for this TIME ELEMENT coverage extension the **Period of Liability** will:

    I. start on the date of such physical loss or damage; and

    II. end on the earlier of:

        1) the date when such INSURED PROPERTY could be repaired or replaced and made ready for operations, but not to be limited by POLICY Expiration Date; or

        2) the date when **Research and Development** activities resume.

To the extent the Insured is capable of making up any **Research and Development** activities it shall be taken into account when adjusting the loss.

### 15. Service Interruption – Time Element

a. This POLICY is extended to insure loss of **Gross Earnings**, **Gross Profits**, **Rental Insurance**, and **Extra Expense** incurred by the Insured at INSURED LOCATION(S) when such loss results from the interruption of services consisting of:

    I. in coming electricity;

    II. incoming fuel;

    III. incoming gas;

    IV. incoming refrigerant;

    V. incoming steam;

    VI. incoming water;

    VII. outgoing sewerage service; or

    VIII. incoming or outgoing audio, voice and video;

b. This extension of coverage applies only when such interruption of service is caused by direct physical loss or damage insured by this POLICY to any property of the type insured by this POLICY of the supplier of such services if such property is situated within the **Policy Territory**.

c. The Insured agrees to immediately notify the suppliers of services of any interruption of such services.

d. No coverage is provided under this extension of coverage:

    I. unless the period of service interruption exceeds the WAITING PERIOD specified for this extension; or

    II. if the interruption of such services is caused by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such services; or

    III. for loss sustained at any **Miscellaneous Unnamed Location**; or

IV.  for loss or damage caused by or resulting from EARTH MOVEMENT for property located in California, in the NEW MADRID SEISMIC ZONE or in the PACIFIC NORTHWEST SEISMIC ZONE, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

16.  **Soft Costs**

This POLICY is extended to insure the necessary SOFT COSTS incurred by the Insured during the PERIOD OF DELAY, unless otherwise provided, and directly resulting from a DELAY IN COMPLETION caused by direct physical loss or damage insured by this POLICY to real or personal property of the type insured which is in the course of construction, alteration, extension or renovation at INSURED LOCATION(S).

SOFT COSTS means additional costs over and above those that would have been incurred at an INSURED LOCATION in the course of construction, alteration, extension or renovation, in the absence of a delay caused by such physical loss or damage of the type insured against to real or personal property of the type insured.  SOFT COSTS are limited to the following:

a.  Additional construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including: the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary. These fees need not be incurred during the PERIOD OF DELAY but must result directly from a covered DELAY IN COMPLETION;

b.  Additional commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s) and the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s). These fees need not be incurred during the PERIOD OF DELAY but must result directly from a covered DELAY IN COMPLETION;

c.  Additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of the construction, alteration, extension or renovation as planned prior to such physical loss or damage;

d.  Additional real estate taxes;

e.  Additional interest on loans to fund the construction, alteration, extension or renovation; and

f.  Additional insurance premiums for insurance specifically arranged for the construction, alteration, extension or renovation (excluding first-party property insurance premium).

DELAY IN COMPLETION means a delay in the completion of the construction, alteration, extension or renovation at INSURED LOCATION(S) directly caused by such physical loss or damage insured by this POLICY to real or personal property of the type insured at INSURED LOCATION(S).

PERIOD OF DELAY means the period of time between: 1) the date on which the construction, alteration, extension or renovation at INSURED LOCATION(S) would have been complete in the absence of direct physical loss or damage insured by this POLICY to real or personal property of the type insured at INSURED LOCATION(S) and; 2) the date on which construction, alteration, extension or renovation at INSURED LOCATION(S) is actually complete following such physical loss or damage insured by this POLICY to real or personal property of the type insured at INSURED LOCATION(S).  The PERIOD OF DELAY shall be adjusted for any causes of a DELAY IN COMPLETION of the construction, alteration, extension or renovation at INSURED LOCATION(S) other than such physical loss or damage insured by this POLICY to real or personal property of the type insured at INSURED LOCATION(S), whether happening before or after such physical loss or damage.

## SECTION VI
## EXCLUSIONS

### A. Property Not Insured

INSURED PROPERTY does not include and this POLICY does not insure loss or damage to the following:

1. bills, notes, MONEY, SECURITIES, PRECIOUS METALS, precious stones, semi-precious stones, jewelry, furs;

2. land, water or any other substance in or on land, except this exclusion does not apply to:

    a. LAND IMPROVEMENTS

    b. water which is normally contained within any enclosed tank, piping system or any other processing equipment;

3. animals, growing and standing crops, trees, standing timber, plants, shrubs and lawns, except this exclusion does not apply to property that is LAND IMPROVEMENTS as defined herein;

4. aircraft or watercraft and contents thereof, rolling stock, spacecraft, satellites including their launch vehicles and launch sites;

5. waterborne equipment or OFFSHORE property, including any OFFSHORE drilling and production rigs. OFFSHORE property means property away from the shore but not connected to the shore by dock, piers or any other physical connection other than pipelines. In the Gulf of Mexico off Texas and Louisiana, OFFSHORE is to be seaward of the Inland edge of the Lease Block of the Plane Coordinate System, as defined on United States Department of Land Management Leasing Maps;

6. motor vehicles licensed for highway use, except when at INSURED LOCATION(S). This POLICY does insure the INSURED'S LIABILITY for motor vehicles of others while at INSURED LOCATION(S);

7. underground mines, mine shafts, caverns, tunnels, or any property within such underground mines, mine shafts, caverns or tunnels;

8. underwater piping and its contents, fittings, conduits, drains or flues, all situated outside INSURED LOCATION(S);

9. air supported structures and the contents thereof;

10. bulkheads, bridges, retaining walls, revetments, dikes, jetties, wharves, piers, docks, levees and property thereon when loss or damage is caused by action of water or ice or impact of watercraft;

11. above ground transmission and distribution lines including but not limited to wires, cables, poles, pylons, transformers, standards, towers or other supporting structures, which may be attendant to the transmission or distribution of electrical power, telephone or telegraph signals, and all other communications signals, whether audio or visual. However, this exclusion does not apply when such property is situated at INSURED LOCATION(S). Nor does this exclusion apply to coverage granted under **Service Interruption** provisions of this POLICY;

12. nuclear power plants, facilities handling or processing nuclear fuel or waste;

13. property in transit, except as otherwise provided under the **Transportation** provision of this POLICY;

14. property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the **Installment Or Deferred Payments** provision of this POLICY;

15.  property at INSURED LOCATION(S) where the Insured has ceased operations except as provided under the **Vacancy** provision of this POLICY;

16.  contractors' and subcontractors' machinery, tools and equipment used in erection of INSURED PROPERTY unless the total capital value of such property is directly and specifically charged to the Insured as part of the job or project to which the machinery, tools or equipment are provided;

17.  the Insured's product when loss or damage is caused by or results from errors in design, poor workmanship, or use of faulty materials, in the development, processing, testing or manufacture of the Insured's product;

18.  stock or materials when loss or damage is caused by manufacturing or processing operations which result in damage to such property while being processed, manufactured, tested or otherwise being worked upon;

19.  ELECTRONIC DATA PROCESSING MEDIA for, or programming records pertaining to electronic and electromechanical data processing or electronically controlled equipment, including the data thereon when loss or damage is caused by error or omission in machine programming or instructions to machine;

20.  ELECTRONIC DATA, except as may be otherwise provided under **Data Restoration** coverage provided elsewhere;

21.  the interior portion of buildings under construction, alteration or repair when loss or damage is caused by rain, sleet or snow, whether or not driven by WIND, when the installation of the roof, walls and windows of such buildings has not been completed.

## B.  Types of Loss or Damage Not Insured

This POLICY does not insure against the following types of loss or damage:

1.  a.  indirect or remote loss or damage;

    b.  delay or loss of market; or

    c.  interruption of business unless otherwise provided hereon;

2.  the cost of correcting or making good, including but not limited to the costs that would have been incurred to rectify any of the following had such rectification been effected immediately prior to the loss or damage:

    a.  fault, inherent or latent defect, error, deficiency or omission in construction, design, plans, specifications, engineering or surveying; or

    b.  faulty or defective workmanship, supplies or material;

3.  unexplained or mysterious disappearance of any property, or shortage disclosed by audit or upon taking inventory;

4.  accumulated effects of smog, smoke, vapor, liquid and dust;

5.  a.  wear and tear, deterioration, depletion, erosion, corrosion;

    b.  settling, cracking, shrinkage, bulging or expansion of pavements, foundations, walls, floors, roofs or ceilings; or

    c.  shrinkage, evaporation, leakage of contents, change in flavor or texture or finish, decay or other spoilage;

    unless physical loss or damage insured by this POLICY results, then only that resulting loss or damage is insured.

6. mold, mildew, fungus, spores or other microorganism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health, wet rot or dry rot, unless such loss or damage results directly from physical loss or damage insured by this POLICY and then only to the limit of liability shown in the **Coverage Purchased and Coverage Not Purchased** section of this POLICY.

If no limit of liability is shown in the **Coverage Purchased and Coverage Not Purchased** section of this POLICY, then this exclusion applies regardless whether there is:

a. any physical loss or damage to INSURED PROPERTY;

b. any insured cause of loss or damage, whether or not contributing concurrently or in any sequence;

c. any loss of use, occupancy, or functionality; or

d. any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

7. Any and all loss or damage, including TIME ELEMENT, occasioned by damage to or failure of, any type whatsoever, to the internet including the World Wide Web (WWW), unless physical loss or damage insured by this POLICY results, then only that resulting loss or damage is insured.

8. Any loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

## C. Causes of Loss Not Insured

This POLICY does not insure against loss or damage caused by any of the following:

1. Animals, vermin or insects unless physical loss or damage insured by this POLICY results, then only that resulting loss or damage is insured;

2. Any fraudulent, dishonest or other act intended to result in a financial gain of the Insured or any associate, proprietor, director, trustee, officer, employee or agent of any insured;

3. Dampness or dryness of atmosphere, or extremes or changes of temperature, unless physical loss or damage insured by this POLICY results, then only that resulting loss or damage is insured;

4. Lack of the following services when caused by loss or damage to any property outside INSURED LOCATION(S):

a. incoming electricity, fuel, gas, refrigerant, steam, water;

b. outgoing sewerage; or

c. incoming or outgoing audio, voice and video;

This exclusion does not apply to the **Service Interruption – Property Damage** and **Service Interruption - Time Element** provisions of this POLICY.

5. Loss or damage due to the discharge, dispersal, seepage, migration, release or escape of CONTAMINANTS (except as provided under the **Radioactive Contamination** provision of this POLICY), unless the discharge, dispersal, seepage, migration, release or escape is directly caused by physical loss or damage insured by this POLICY.

6. Loss or damage caused by any of the following, regardless of any other cause or event contributing concurrently or in any other sequence to the loss or damage:

a.  Nuclear reaction or nuclear radiation, or radioactive contamination (except as provided under the **Radioactive Contamination** provision of this POLICY), all whether controlled or uncontrolled. However, subject to the foregoing and all provisions of this POLICY, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this POLICY.

b.  Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack:

   I.  by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or

   II.  by military, naval or air forces; or

   III.  by an agent of any such government, power, authority or forces;

   it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such a hostile or warlike action by such a government, power, authority or forces;

c.  insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an OCCURRENCE.

d.  The unlawful possession, use, release, discharge, dispersal or disposal of any chemical, bacteriological, viral, radioactive or similar agents or matter regardless of who is responsible for the act and whether war has been declared or not.

e.  The unlawful possession, use, release, discharge, detonation, dispersal or disposal of any device or material capable of producing a nuclear reaction or the spread of radioactivity, regardless of who is responsible for the act and whether war has been declared or not.

7.  Enforcement of any law, ordinance, regulation or rule regulating or restricting the construction, installation, repair, replacement, demolition, occupancy, operation or other use of property on INSURED LOCATION(S) except as provided in the **Demolition and Increased Cost of Construction** provision of this POLICY.

8.  Any increase of loss resulting from interference at INSURED LOCATION(S) by strikers or other persons, with rebuilding, repairing or replacing property or with the resumption or continuation of business.

9.  Any loss, damage, destruction, distortion, erasure, corruption or alteration of ELECTRONIC DATA from any cause whatsoever (including but not limited to COMPUTER VIRUS) or loss of use, reduction in functionality, cost, expense of whatsoever nature resulting there from, unless physical loss or damage insured by this POLICY results, then only that resulting loss or damage is insured.

   ELECTRONIC DATA means facts, concepts and information converted to a form useable for communications, interpretation or processing by electronic and electromechanical data processing or electronically controlled equipment and includes programs, software, and other coded instructions for the processing and manipulation of data or the direction and manipulation of such equipment.

   COMPUTER VIRUS means a set of corrupting, harmful or otherwise unauthorized instructions or code including a set of maliciously introduced unauthorized instructions or code, programmatic or otherwise, that propagate themselves through a computer system or network of whatsoever nature. COMPUTER VIRUS includes but is not limited to 'Trojan Horses', 'worms' and 'time or logic bombs'.

## D.  Time Element Exclusions

1.  This POLICY does not insure against TIME ELEMENT loss for any period during which business would not or could not have been conducted for any reason other than physical loss or damage insured by this POLICY to INSURED PROPERTY.

2. This POLICY does not insure against any increase in the TIME ELEMENT loss due to:

   a. suspension, cancellation or lapse of any lease, contract, license or orders;

   b. damages for breach of contract or for late or non-completion of orders;

   c. fines or penalties of any nature; or

   d. any other consequential or remote loss.

   However, a. and d. above do not apply to **Gross Profits** or **Extended Period of Liability** provision of this POLICY.

3. This POLICY does not insure against **any Gross Earnings** loss resulting from loss or damage to FINISHED GOODS manufactured by the Insured or MERCHANDISE when valued at its selling price, nor the time required for their reproduction. However, this exclusion does not apply to **Gross Profits**.

## SECTION VII
## VALUATION

A. Adjustment of the loss amount for physical loss or damage insured by this POLICY will be computed as of the date of loss at the INSURED LOCATION(S) where such physical loss or damage occurred, and for no more than the interest of the Insured in such property, subject to the following:

1. buildings and structures, building equipment, plant equipment, machinery, machine parts, office furniture, office equipment, tools, dies, jigs, templates, patterns and flasks, except all such property that is obsolete or useless to the Insured:

   a. if repaired, rebuilt or replaced, at the same or at another site, within two (2) consecutive calendar years from the date of loss or damage, the lesser of the following:

      I. the cost to repair, rebuild or replace on the same site, with new and current materials of like size, kind and quality, whichever is the least:

      II. the actual expenditure incurred by or on behalf of the Insured in repairing, rebuilding or replacing on the same or another site, whichever is the least;

      but in no event to include any increased costs resulting from the enforcement of any law, ordinance, regulation or rule regulating or restricting the construction, installation, repair, replacement, demolition, occupancy, operation or other use of property at INSURED LOCATION(S);

   b. if not repaired, rebuilt or replaced, at the same or another site, within two (2) consecutive calendar years from the date of loss or damage:

      the ACTUAL CASH VALUE at the time and place of loss.

2. catalysts or refractory material:

   the ACTUAL CASH VALUE of the material which equals the replacement cost at the time of loss or damage multiplied by the remaining useful life factor. Remaining useful life factor means the normal useful life of the material in months minus the number of months the material had been in use at the time of the loss or damage, divided by the normal useful life of the material in months.

3. FINISHED GOODS manufactured by the Insured:

   a. as respects INSURED LOCATION(S) where **Gross Profits** applies, the replacement cost:

   b. as respects all other INSURED LOCATION(S), the regular cash selling price less all discounts and charges to which the FINISHED GOODS would have been subject and a commensurate reduction to reflect waste, pilferage, breakage, spoilage or other factors that would have affected the sale of FINISHED GOODS had no physical loss or damage occurred.

4. motor vehicles or other mobile equipment not manufactured by the Insured, the least of the following:

   a. the repair cost:

   b. the replacement cost: or

   c. the ACTUAL CASH VALUE if not replaced.

5. Pair, Set or Parts - In the event of loss of or damage (as insured against by this POLICY) to:

   a. any article or articles which are a part of a pair or set, the measure of loss of or damage to such article or articles shall be a reasonable and fair proportion of the total value of the pair or set, giving consideration to the importance of said article or articles, but in no event shall such loss or damage be construed to mean total loss of the pair or set: or

      b.     any part of INSURED PROPERTY consisting, when complete for use, of several parts, the Company shall be liable only for the value of the part lost or damaged.

6.    RAW STOCK, MERCHANDISE and supplies:

    the replacement cost, unless the regular cash selling price less all discounts and charges for merchandise has been specifically submitted to, accepted by and on file with the Company.

7.    STOCK IN PROCESS:

      a.     the replacement cost of raw materials;

      b.     the cost of labor expended at the time of loss or damage; and

      c.     the proper proportion of overhead charges.

8.    exposed films, records, manuscripts, and drawings that are not VALUABLE PAPERS AND RECORDS:

      a.     the replacement cost of exposed films, records, manuscripts, and drawings blank; plus

      b.     the cost of copying information from back-ups or from originals of a previous generation;

      c.     excluding all other costs, such as the cost for research or engineering, incurred in restoring or recreating the information lost, except as may be otherwise provided under **Data Restoration** coverage provided elsewhere.

9.    VALUABLE PAPERS AND RECORDS, the least of the following:

      a.     the reasonable and necessary costs to repair or restore to a functional usage condition;

      b.     the replacement cost;

      c.     excluding all other costs, such as the cost for research, engineering, programming, or assembling or gathering information, incurred in restoring or recreating the ELECTRONIC DATA lost, except as may be otherwise provided under **Data Restoration** coverage provided elsewhere.

10.    ELECTRONIC DATA PROCESSING MEDIA

      a.     if repaired or replaced within two (2) consecutive calendar years from the date of loss or damage:

            I.    the cost of the ELECTRONIC DATA PROCESSING MEDIA blank; plus the cost to repair, replace or restore such ELECTRONIC DATA PROCESSING MEDIA to the condition that existed immediately prior to such loss or damage, including the cost of copying the ELECTRONIC DATA from back-ups or from originals of a previous generation;

      b.     if not repaired or replaced within two (2) consecutive calendar years from the date of loss or damage:

            I.    the replacement cost of the ELECTRONIC DATA PROCESSING MEDIA blank;

      c.     excluding all other costs, such as the cost for research, engineering, programming, or assembling or gathering information, incurred in restoring or recreating the ELECTRONIC DATA lost, except as may be otherwise provided under **Data Restoration** coverage provided elsewhere.

11.    FINE ARTS, the least of the following:

      a.     the reasonable and necessary costs to repair or restore to the functional usable condition that existed immediately prior to the physical of loss or damage;

      b.     the replacement cost of substantially identical property;

    c.    the ACTUAL CASH VALUE if not repaired or replaced or designated;

    d.    the amount designated, if any, for such FINE ARTS on the latest schedule submitted to, accepted by and on file with the Company.

    e.    In the event a FINE ARTS article is part of a pair or set, and such article, if physically damaged, cannot be repaired or replaced or restored to the physical condition that existed immediately prior to the physical loss or damage, the amount recoverable under this POLICY will be limited to the lesser of the following:

        I.    the full value of the pair or set; or

        II.    the amount designated, if any, for such FINE ARTS pair or set on the latest schedule submitted to, accepted by and on file with the Company.

The Insured agrees to surrender the pair or set to the Company.

12.    property insured under **Transportation**:

    a.    As respects property shipped to or for the account of the Insured, the actual invoice to the Insured including accrued costs and charges legally due to the Insured. Such charges may include the Insured's commission as a selling agent.

    b.    As respects property sold by the Insured and shipped to or for the purchaser's account, the Insured's selling invoice amount including prepaid or advanced freight costs.

    c.    As respects property not under invoice:

        I.    for property of the Insured, based on the **Valuation** provisions of this POLICY applying to the LOCATION from which the property is being transported;

        II.    for other property, the ACTUAL CASH VALUE at the destination point on the date of the OCCURRENCE;

less any charges saved which would have become due and payable upon arrival at destination.

13.    IMPROVEMENTS AND BETTERMENTS:

    a.    if repaired or replaced at the expense of the Insured within two (2) consecutive calendar years from the date of loss or damage, the lesser of the following:

        I.    the cost to repair or replace the lost or damaged IMPROVEMENTS AND BETTERMENTS with new and current materials of like size, kind and quality, whichever is less;

        II.    the actual expenditure incurred in repairing or replacing the lost or damaged IMPROVEMENTS AND BETTERMENTS, whichever is less;

    b.    if not repaired or replaced within two (2) consecutive calendar years after such loss or damage:

    that proportion of the original cost at the time of installation of the lost or damaged IMPROVEMENTS AND BETTERMENTS which the unexpired term of the lease at the time of loss or damage bears to the period from the date such IMPROVEMENTS AND BETTERMENTS were made to the expiration date of the lease as of the date of loss or damage, and not including any rights or options for extensions or renewals;

    c.    if repaired or replaced at the expense of others for the use of the Insured, there shall be no liability hereunder.

14.    unrepairable electrical or mechanical equipment, including computer equipment:

the cost to replace such damaged or destroyed property with the most functionally equivalent new and current equipment of like size, kind and quality even if such equipment:

    a.    has technological advantages;

    b.    represents an improvement in function; or

    c.    forms part of a program or system enhancement.

15.    property planned and/or scheduled for demolition at the time of the loss or damage:

only the increased cost of demolition, if any, resulting from physical loss or damage insured by this POLICY.

16.    real property or machinery and equipment, other than stock, held for sale at the time of the loss or damage. The lesser of the following:

    a.    the reasonably anticipated selling price;

    b.    market value.

17.    personal property of others for which the Insured is legally liable in the event of loss or damage:

the amount otherwise recoverable in accordance with the **Valuation** provisions of this POLICY, but not to exceed the amount for which the Insured is legally liable.

18.    property covered under **Installment or Deferred Payments** provision the loss amount will not exceed the least of the following:

    a.    total amount of unpaid installments less finance charges:

    b.    ACTUAL CASH VALUE of the property at the time of loss;

    c.    cost to repair or replace with material of like size, kind and quality.

19.    all other property, including property that is obsolete or useless to the Insured:

the ACTUAL CASH VALUE.

B.    The Insured may elect not to repair or replace any real and personal property lost, destroyed or damaged and insured hereunder. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two (2) consecutive calendar years from the date of physical loss or damage. As a condition of collecting herein, such expenditure must be unplanned as of the date of physical loss or damage. This does not extend to **Demolition and Increased Cost of Construction** provision of this POLICY.

## SECTION VIII
## LOSS ADJUSTMENT AND SETTLEMENT

### A. Abandonment

There may be no abandonment of any property to the Company.

### B. Collection from Others

The Company will not be liable for any loss or damage insured hereunder to the extent that the Insured has collected for such loss or damage from others or others have funded the repair or replacement of any property lost or damaged.

### C. Company Option

1.  Subject to the **Control of Damaged Property** provision, the Company has the option to take all or any part of damaged property at the agreed value within a reasonable time.

2.  The Company must give notice to the Insured of its intention to do so within thirty (30) consecutive calendar days after receipt of the signed and sworn to proof of loss required by this POLICY.

### D. Dispute Resolution / Optional Arbitration Provision

Upon the mutual agreement of the Company and the Insured, any controversy or dispute arising out of or relating to this POLICY, or the breach, termination or validity thereof, shall be resolved in accordance with the procedures specified herein.

1.  Negotiation and Mediation

    The Insured and the Company shall attempt in good faith to resolve any controversy or dispute arising out of or relating to this POLICY promptly by negotiations between representatives who have authority to settle the controversy. If the dispute cannot be resolved by negotiation, the parties shall endeavor to settle the dispute through a confidential mediation with the assistance of a mediator mutually selected by the parties. To the extent the parties are unable to select a mutually agreeable mediator, each party will propose three mediators. Each party then shall strike two of the mediators proposed by the other, leaving one mediator as proposed by each party. A coin then shall be tossed, with the Insured calling heads or tails, with the prevailing party in the coin toss having its remaining proposed mediator jointly engaged by the parties to mediate the dispute, with the cost being split equally among the parties.

2.  Arbitration

    a.  If a resolution cannot be achieved through the negotiation and mediation process as set forth above, the parties can mutually agree to submit the remaining dispute to be determined through binding arbitration before a panel of three arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). Provisions in the Commercial Arbitration Rules pertaining to mediation shall not apply.

    b.  Notwithstanding anything to the contrary in the Commercial Arbitration Rules, the panel of arbitrators shall be constituted as follows. The Insured and the Company each shall appoint one arbitrator within 14 days of mutually agreeing to arbitrate. The third arbitrator, who shall serve as the chair of the arbitration panel, shall be appointed by the parties upon mutual agreement. If the parties are unable to mutually agree upon a third arbitrator within 30 days of the selection of party-appointed arbitrators, the AAA shall appoint the chairperson in accordance with the rules for doing so in the Commercial Arbitration Rules.

c.    In any such arbitration, the terms of this POLICY are to be construed in an evenhanded fashion as between the Insured and the Company in accordance with the laws of the state of New York. The arbitrators are not empowered to award damages in excess of compensatory damages and each party hereby irrevocably waives such damages.

3.    Appraisal Provision

If the Insured and the Company fail to agree on the amount of loss to be paid for a claim insured by this POLICY and a resolution cannot be achieved through the negotiation and mediation process as set forth above, and the parties do not mutually agree to submit the dispute to be determined through binding arbitration, either may elect to have that dispute resolved by appraisal by making a written demand upon the other. The venue of the appraisal shall be the State and County of the mailing address for the Insured as set forth in the Declarations of this POLICY. Each party shall select a competent and disinterested appraiser within twenty (20) days after the written demand for appraisal is made. The appraisers then shall select a third competent and disinterested appraiser to serve as the umpire. If they should fail to agree upon an umpire within fifteen (15) days after both appraisers are selected, then upon the request of the Insured, or of the Company, such umpire shall be selected by a judge of a court of record and competent jurisdiction in the county in which the appraisal is venued. After the panel of three appraisers has been constituted, the two appraisers selected by the Insured and the Company shall make a good faith effort to appraise and agree upon the amount of the loss in dispute or portions thereof. If the appraisers fail to fully agree, they shall submit their differences to the umpire. An award in writing and signed by any two (2) of the appraiser shall determine the amount of loss. The Insured and the Company shall each pay their selected appraiser and shall bear equally the other expenses of the appraisal and of the umpire. The Company shall not be held to have waived any of its rights by any act relating to appraisal.

## E.    Identity of Interests

If the Insured is comprised of more than one legal entity, liability shall not exceed the amount of loss had all interests comprised a single legal entity.

## F.    Loss Adjustment and Loss Payable

Loss, if any, will be adjusted with and payable to the First Named Insured, or as may be directed by the First Named Insured. Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee or loss payee in the Certificates of Insurance on file with the Company. The receipt of the payee(s) so designated shall constitute a release in full of all liability with respect to such loss.

## G.    Partial Payment of Loss Settlement

1.    In the event of a loss occurring which has been ascertained by the Company to be recoverable under this POLICY, the Company will advance mutually agreed upon partial payments for such loss, subject to the provisions of this POLICY.

2.    To obtain such partial payments, the Insured agrees to submit a signed and sworn partial proof of loss as described in this POLICY with adequate supporting documentation.

## H.    Requirements in Case of Loss

The Insured shall give immediate written notice to the Company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, ACTUAL CASH VALUE and amount of loss claimed; and within sixty (60) days after the loss, unless such time is extended in writing by the Company, the Insured shall render to the Company a proof of loss, signed and sworn to by the Insured, stating the knowledge and belief of the Insured as to the following:

1.    the time and origin of the loss;

2.    the interest of the Insured and of all others in the property;

3.    the ACTUAL CASH VALUE of each item thereof and the amount of loss thereof;

4.    all encumbrances thereon;

5.    all other contracts of insurance, whether valid or not, insuring any of said property;

6.    any changes in the title, use, occupation, LOCATION(S), possession or exposures of said property since the issuing of this POLICY, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all policies or on file with the Company and, if required, verified plans and specifications of any building, fixtures or machinery destroyed or damaged.

7.    the Insured, as often as may be reasonably required, shall exhibit to any person designated by the Company all that remains of any property herein described, and submit to examinations under oath by any person named by the Company, and subscribe the same; and, as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or its representative, and shall permit extracts and copies thereof to be made.

## I.    Salvage and Recovery

Any salvage or other recovery, except recovery under **Subrogation** or **Other Insurance** section, will accrue entirely to the benefit of the Company until the sum paid by the Company is recovered.

## J.    Settlement of Claims

The amount of loss or damage, for which the Company may be liable, will be paid within thirty (30) consecutive calendar days after:

1.    proof of loss as described under **Requirements in Case of Loss** section is accepted in writing by the Company; and

2.    when a resolution of the amount of loss is made either by:

a.    agreement in writing between the Insured and the Company; or

b.    the filing with the Company of an award as provided under the **Arbitration or Appraisal Provision** section.

## K.    Subrogation

In the event of any payment made under this POLICY:

1.    the Company will be subrogated to all of the Insured's rights of recovery against any person, entity or organization;

2.    the Insured agrees to execute and deliver instruments and papers and do whatever is necessary to secure such rights;

3.    the Company will not acquire any rights of recovery that the Insured has expressly waived, in writing, prior to loss or damage, nor will such waiver affect the Insured's rights under this POLICY;

4.    the Insured agrees to do nothing after loss or damage to prejudice the subrogation rights of the Company;

5.    the Insured agrees to cooperate with the Company and upon the Company's request and expense, attend hearings and trials and assist in:

    a.    effecting settlements;

    b.    securing and giving information and evidence;

    c.    obtaining the attendance of witnesses; and

    d.    pursuing recovery through legal action or other formal proceedings;

6.    the net amount of any recovery after deducting the costs of proceedings shall be divided between each party instituting such proceedings in the same proportion as each such party has borne to the provable loss.

## L.   Suit

No suit or action on this POLICY for the recovery of any claim shall be sustainable in any court of law unless all the requirements of this POLICY shall have been complied with, and unless commenced within twelve (12) months next after the date of the physical loss or damage giving rise to any claim hereunder.

## SECTION IX
## GENERAL CONDITIONS

### A. Additional Insurable Interests

Additional insured interests are automatically added to this POLICY as their interests may appear when named as additional named insured, lender, mortgagee or loss payee in the Certificates of Insurance on file with the Company. Such interests become effective on the dates shown in such certificates but do not further amend or extend the terms, conditions, provisions and limitations of this POLICY.

### B. Assignment of Policy

Assignment of this POLICY is not valid except with the written consent of the Company.

### C. Concealment, Misrepresentation and Fraud

This entire POLICY shall be void if, whether before or after loss or damage, the Insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, a claim for loss or damages or the interest of the Insured therein, or in case of any fraud or false swearing by the Insured relating thereto.

### D. Conditions Suspending or Restricting Insurance

Unless otherwise provided in writing added hereto the Company shall not be liable for loss or damage occurring while the hazard is increased by any means within the control or knowledge of the Insured.

### E. Excess Insurance

Permission is granted to the Insured to have excess insurance over the limit(s) of liability set forth in this POLICY without prejudice to this POLICY, and the existence of such insurance, if any, shall not reduce any liability under this POLICY.

### F. Governing Law and Jurisdiction

1.  The laws of the State of New York, without regard to its conflict of laws rules, that would cause the application of the laws of any other jurisdiction, shall govern the construction and interpretation of this POLICY.

2.  The parties hereto do irrevocably submit to the exclusive jurisdiction of the Courts of the State of New York, and to the extent permitted by law, the parties expressly waive all rights to challenge or otherwise limit such jurisdiction.

3.  If the First Named Insured's principal place of business is in Canada, this POLICY will be governed by the law of Canada. Any disputes arising hereunder will be exclusively subject to Canadian jurisdiction.

### G. Inspection of Property and Operations

The Company shall be permitted but not obligated to inspect the Insured's property and operations at any reasonable time. Neither the right to make inspections nor the making thereof nor any risk analysis for any particular hazards, exposures or potential risks of loss or damage nor any advice or report resulting there from shall imply any liability, nor constitute an undertaking on behalf of or for the benefit of the Insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

## H. Liberalization

If during the period that insurance is in force under this POLICY, or within forty-five (45) days prior to the inception date thereof, on behalf of the Company there be filed with and approved or accepted by the insurance supervisory authorities, in conformity with law, any changes in the forms or endorsements attached to this POLICY, or the rules or regulations applying thereto, by which this insurance could be extended or broadened, without increased premium charge, by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the Insured as though such endorsement or substitution of form has been made.

## I. Notice of Cancellation

This POLICY may be canceled

1.   at any time at the request of the First Named Insured:

  a.   by surrendering this POLICY to the Company; or

  b.   by giving written notice to the Company stating when thereafter such cancellation will be effective; or

2.   by the Company by giving the First Named Insured written notice at least:

  a.   ten (10) consecutive calendar days before the effective date of cancellation in the event the Company does not receive the premium by the date payment thereof becomes due; or

  b.   ninety (90) consecutive calendar days before the effective date of cancellation for any other reasons.

If notice is mailed, then proof of mailing is sufficient proof of notice.

If the First Named Insured cancels this POLICY, then any unearned premium will be calculated based on the customary short rate table. However, if the Company cancels this POLICY, any unearned premium will be calculated on pro-rata basis. The Company agrees to return any unearned premium due the Insured as soon as practicable.

## J. Occurrence Hour Clause

1.   Subject to the **Prior or Subsequent Loss** condition of this POLICY, each loss OCCURRENCE by EARTH MOVEMENT shall constitute a single claim hereunder, provided, if more than one EARTH MOVEMENT shall occur within any continuous period of one-hundred-sixty-eight (168) hours during the term of this POLICY, such EARTH MOVEMENT shall be deemed to be a single OCCURRENCE of EARTH MOVEMENT.

2.   Subject to the **Prior or Subsequent Loss** condition of this POLICY, when the word OCCURRENCE applies to loss or damage resulting from tornado, WIND, NAMED WINDSTORM, hail, riot, riot attending a strike, civil commotion, and malicious mischief, if such causes of loss are insured by this POLICY one event will be construed to be all losses arising during a continuous period of seventy-two (72) hours.

3.   When filing a proof of loss, the Insured may elect the moment at which such **Occurrence Hour Clause** hour period is deemed to have commenced, which will not be earlier than when the first physical loss or damage to property or interests insured by this POLICY occurs.

## K. Other Insurance

The Company shall not be liable if, at the time of loss or damage there is any other insurance or warranty which would attach if this insurance had not incepted, except that this insurance shall apply only as excess and in no event as contributing insurance, and then only after all other insurance or any warranty has been exhausted.

## L.   Policy Modification

1.   This POLICY contains all of the agreements between the Insured and the Company concerning this insurance.

2.   This POLICY can be changed only by endorsements issued by the Company and made part of this POLICY.

3.   Notice to any agent of the Insured or knowledge possessed by any agent of the Insured or by any other person does not:

   a.   create a waiver or change any part of this POLICY; or

   b.   prevent the Company from asserting any rights under the provisions of this POLICY or law.

## M.   Prior or Subsequent Loss

The Company is not liable hereunder for any loss or damage:

1.   occurring before the POLICY becomes effective; or

2.   arising from an OCCURRENCE which is in progress at the time this POLICY becomes effective, even if such loss or damage occurs after this POLICY becomes effective; or

3.   occurring after the expiration of this POLICY, except loss or damage arising from an OCCURRENCE in progress at the time this POLICY expires.

## N.   Reduction by Loss

Except with respect to any aggregate limit of liability, any paid loss shall not reduce any other limit of this POLICY.

## O.   Several and Not Joint Liability

The liability of the Company shall be several and not joint and is limited solely to the extent of Company's individual share. The Company is not responsible for the subscription of any co-subscribing company or reinsurer who for any reason does not satisfy all or part of its obligations.

## P.   Suspension

Upon discovery of a dangerous condition with respect to any boiler, fired or unfired pressure vessel, refrigerating or air conditioning system, piping and its accessory equipment and any mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power, any representative of the Company may immediately suspend the insurance with respect to loss or damage to said object by written notice mailed or delivered to the Insured at the address of the Insured, or at the LOCATION of the object, as specified for it in the Schedule of Locations on file with the Company. Insurance so suspended may be reinstated by the Company, but only by an endorsement issued to form a part hereof. The Insured shall be allowed the unearned portion of the premium paid for such suspended insurance, pro rata, for the period of suspension.

## Q.   Titles of Paragraphs

The titles of the paragraphs of this form (and of endorsements and supplemental contracts, if any, now or hereafter attached to this POLICY) are inserted solely for convenience of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

## R. Underlying Insurance

Permission is granted the Insured to purchase insurance on all or any part of the deductibles of this POLICY, and the existence of such underlying insurance shall not prejudice any recovery otherwise payable under this POLICY. If the limits of such underlying insurance exceed the deductible which would apply under this POLICY, then the insurance provided by this POLICY shall apply only as excess after that portion which exceeds such deductible has been exhausted.

## SECTION X
## DEFINITIONS

Unless otherwise defined elsewhere, the following Definitions apply when the term is used in this POLICY.

A.    ACCOUNTS RECEIVABLE

The total of:

a.    all sums due the Insured from customers, provided the Insured is unable to effect collection thereof as the result of physical loss or damage to the ELECTRONIC DATA PROCESSING MEDIA of accounts receivable records; and

b.    interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage; and

c.    collection expense in excess of normal collection cost and made necessary because of such loss or damage; and

d.    other expenses, when reasonably incurred by the Insured in re-establishing the ELECTRONIC DATA of accounts receivable records following such loss or damage.

B.    ACTUAL CASH VALUE

The amount it would cost to repair or replace INSURED PROPERTY on the date of the physical loss or damage with new and current material of like size, kind and quality and with proper deduction for obsolescence and physical depreciation. ACTUAL CASH VALUE is expected to be less than, and cannot exceed, replacement cost.

C.    COMMUNICABLE DISEASE

Disease which is:

a.    transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

b.    Legionellosis.

D.    CONTAMINANT(S)

a.    Materials that may be harmful to human health, wildlife or the environment. CONTAMINANTS include any impurity, solid, liquid, gaseous or thermal irritant or pollutant, poison, toxin, pathogen or pathogenic organism, disease-causing or illness-causing agent, asbestos, dioxin, polychlorinated biphenyls, agricultural smoke, agricultural soot, vapor, fumes, acids, alkalis, chemicals, bacteria, virus, vaccines, waste, and hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act, Toxic Substances Control Act, or as designated by the United States Environmental Protection Agency or any other local governmental agency.

b.    However, CONTAMINANTS do not include fungi.

E.    EARTH MOVEMENT

a.    Any earthquake, landslide, avalanche, subsidence, sinkhole, volcanic eruption, tsunami or any other movement of earth arising out of one OCCURRENCE except mudslide or mudflow caused by accumulation of water on or under the ground (all whether or not naturally occurring).

b.    Loss or damage caused by EARTH MOVEMENT shall include all insured loss or damage to INSURED PROPERTY at INSURED LOCATION(S) resulting from EARTH MOVEMENT, except loss or damage from resulting fire, explosion, or sprinkler leakage.

F.    ELECTRONIC DATA PROCESSING MEDIA

The materials upon which data is recorded, including but not limited to, paper tapes, cards, electronic memory circuits and magnetic or optical storage devices.

G.    FINE ARTS

Paintings, etchings, pictures, tapestries, rare or art glass, art glass windows, valuable rugs, statuary, sculptures, antique furniture, antique jewelry, bric-a-brac, porcelains, and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, PRECIOUS METALS, watercraft, aircraft, MONEY, SECURITIES.

H.    FINISHED GOODS

Goods manufactured by the Insured which in the ordinary course of the Insured's business is ready for packing, labeling, shipment or sale.

I.    FLOOD

Surface waters, rising waters, storm surge, sea surge, wave wash, waves, tide or tidal water, the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by WIND or not or caused by, resulting from or accompanying a NAMED WINDSTORM or not; mudslide or mudflow caused by or resulting from surface water, runoff or accumulation of water on or under the ground; or sewer back-up caused by or resulting from any of the foregoing; all regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss, arising out of one OCCURRENCE. Physical loss or damage from FLOOD associated with a NAMED WINDSTORM is considered to be FLOOD within the terms of this POLICY for purposes of exclusions, limits and sublimits hereunder. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from FLOOD is not considered to be loss by FLOOD within the terms and conditions of this POLICY.

J.    HIGH HAZARD FLOOD ZONE

a.    All property at INSURED LOCATION(S) that is wholly or partially situated in an area which at the time of loss or damage has been designated on a Flood Insurance Rate Map (FIRM) to be a Special Flood Hazard Area (SFHA); or

b.    All property in areas where the National Flood Insurance Program (NFIP) is not in effect, and where all property at INSURED LOCATION(S) is wholly or partially situated in an area which is within a one hundred (100) year FLOOD plain or its worldwide equivalent.

K.    IMPROVEMENTS AND BETTERMENTS

Fixtures, improvements, betterments, alterations, installations or additions comprising part of a building occupied but not owned by the Insured and acquired or made at the expense of the Insured, which the Insured cannot legally remove.

L.    INSURED FIXED CHARGES

All fixed charges unless specifically excluded herein or by endorsement.

M.    INSURED LOCATION(S)

LOCATION(S):

a.    listed on the latest schedule of LOCATION(S) submitted to, accepted by and on file with the Company;

b.    insured under **Newly Acquired Property**;

c.    insured under **Errors and Omissions**;

d.   insured under **Miscellaneous Unnamed Locations**;

e.   insured under **Course of Construction**;

f.   INSURED LOCATION(S) includes the area within one thousand (1,000) feet of such LOCATION(S) if within the **Policy Territory**.

N.   INSURED'S LIABILITY

Liability which is imposed by law upon the Insured or is assumed by the Insured by specific agreement prior to loss for physical loss or damage of the type insured against by this POLICY.

O.   LAND IMPROVEMENTS

Landscaping, gardening, roadways and pavements, but not including any fill or land beneath such property.

P.   LOCATION(S)

a.   A building, yard, dock, wharf, pier or bulkhead or any group of the foregoing bounded by public streets, clear land space, open waterways or any combination thereof, with each public street, clear land space or open waterway measuring no less than fifty (50) feet wide. Any bridge or tunnel crossing such streets, space or waterways renders such separation inoperative;

b.   The term LOCATIONS means more than one LOCATION.

Q.   MERCHANDISE

Goods kept for sale by the Insured which are not RAW STOCK, STOCK IN PROCESS or FINISHED GOODS.

R.   MODERATE HAZARD FLOOD ZONE

a.   All property at INSURED LOCATION(S) that is wholly or partially situated in an area which at the time of loss or damage has been designated on a Flood Insurance Rate Map (FIRM) as Zone B or X-shaded but is not in a Special Flood Hazard Area (SFHA) on a FIRM;

b.   all property in areas where the National Flood Insurance Program (NFIP) is not in effect, and where all property at INSURED LOCATION(S) is situated in an area which is outside of a one hundred (100) year FLOOD plain or its worldwide equivalent, but wholly or partially within a five hundred (500) year FLOOD plain or its worldwide equivalent;

Regardless of any Zone or Area designation or assignment by Federal Emergency Management Agency (FEMA) or other recognized authority having jurisdiction. MODERATE HAZARD FLOOD ZONE does not include any property at INSURED LOCATION(S) that is wholly or partially protected by dams, dikes, levees or walls which are intended to protect such property from the level of a one hundred (100) year FLOOD or its worldwide equivalent.

S.   MONEY

Bank notes, coins, currency, money order held for sale to the public, traveler's checks or register checks.

T.    NAMED WINDSTORM

All loss or damage insured by this POLICY, arising out of one OCCURRENCE which is caused by or results from a storm or weather disturbance which is named by the National Weather Service or any other recognized meteorological authority. Storm or weather disturbance includes all weather phenomena insured by this POLICY, associated with or occurring in conjunction with the storm or weather disturbance, including, but not limited to WIND, hail, sleet, tornadoes, hurricane or lightning. To the extent FLOOD is caused by, results from or accompanies a NAMED WINDSTORM, any physical loss or damage caused by, resulting from, or arising out of that FLOOD shall be treated as FLOOD, and not NAMED WINDSTORM, for purposes of exclusions, limits and sublimits hereunder.

U.    NET PROFITS

The net operating PROFITS (exclusive of all capital receipts and accruals and all outlay properly chargeable to capital) resulting from the business of the Insured at INSURED LOCATION(S) after due provision has been made for all INSURED FIXED CHARGES and other expenses including depreciation but before the deduction of any taxes on PROFITS.

V.    NEW MADRID SEISMIC ZONE:

Arkansas, United States of America

Counties of Arkansas, Ashley, Chicot, Clay, Craighead, Crittenden, Cross, Desha, Drew, Fulton, Grant, Greene, Independence, Izard, Jackson, Jefferson, Lawrence, Lee, Lincoln, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Pulaski, Randolph, Saline, Sharp, St. Francis, White, Woodruff;

Illinois, United States of America

Counties of Alexander, Bond, Calhoun, Christian, Clark, Clay, Clinton, Coles, Crawford, Cumberland, Edwards, Effingham, Fayette, Franklin, Gallatin, Greene, Hamilton, Hardin, Jackson, Jasper, Jefferson, Jersey, Johnson, Lawrence, Macoupin, Madison, Marion, Massac, Monroe, Montgomery, Morgan, Perry, Pike, Pope, Pulaski, Randolph, Richland, Saline, Sangamon, Scott, Shelby, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson;

Indiana, United States of America

Counties of Crawford, Daviess, Dubois, Gibson, Greene, Knox, Lawrence, Martin, Orange, Perry, Pike, Posey, Spencer, Sullivan, Vanderburgh, Warrick;

Kentucky, United States of America

Counties of Ballard, Breckinridge, Butler, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Hancock, Henderson, Hickman, Hopkins, Livingston, Logan, Lyon, Marshall, McCracken, McLean, Muhlenberg, Ohio, Simpson, Todd, Trigg, Union, Warren, Webster;

Mississippi, United States of America

Counties of Alcorn, Benton, Bolivar, Calhoun, Carroll, Chickasaw, Choctaw, Clay, Coahoma, De Soto, Grenada, Holmes, Humphreys, Issaquena, Itawamba, Lafayette, Lee, Leflore, Lowndes, Marshall, Monroe, Montgomery, Oktibbeha, Panola, Pontotoc, Prentiss, Quitman, Sharkey, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union, Warren, Washington, Webster, Yalobusha, Yazoo;

Missouri, United States of America

Counties of Audrain, Bollinger, Butler, Callaway, Cape Girardeau, Carter, Cole, Crawford, Dent, Dunklin, Franklin, Gasconade, Howell, Iron, Jefferson, Lincoln, Madison, Maries, Marion, Miller, Mississippi, Montgomery, New Madrid, Oregon, Osage, Pemiscot, Perry, Phelps, Pike, Pulaski, Ralls, Reynolds, Ripley, Scott, Shannon, St. Charles, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Texas, Warren, Washington, Wayne;

Tennessee, United States of America

Counties of Benton, Carroll, Cheatham, Chester, Crockett, Decatur, Dickson, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Hickman, Houston, Humphreys, Lake, Lauderdale, Lawrence, Lewis, Madison, McNairy, Montgomery, Obion, Perry, Robertson, Shelby, Stewart, Tipton, Wayne, Weakley.

W.  OCCURRENCE

The sum total of all loss or damage of the type insured caused by or arising out of one event, including any insured TIME ELEMENT loss, regardless of the number of LOCATIONS affected.

X.  ORDINARY PAYROLL

a.  The entire payroll expenses for employees of the Insured except the following:

 I.  Officers;

 II.  Executives;

 III.  Department managers;

 IV.  Employees under contract whose services must necessarily continue; and

 V.  Other important employees.

b.  Such expenses include the following:

 I.  Payroll;

 II.  Taxes and charges dependent on the payment of wages;

 III.  Employee benefits, if directly related to payroll;

 IV.  FICA payments made by the Insured;

 V.  Union dues paid by the Insured; and

 VI.  Premiums for Workers Compensation

Y.  PACIFIC NORTHWEST SEISMIC ZONE:

Oregon, United States of America

Counties of Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Jackson, Josephine, Klamath, Lake, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill;

Washington, United States of America

Counties of Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom.

British Columbia, Canada

Z.  POLICY

All sections of this document and the appendices and endorsements attached or added to this document.

AA.  PRECIOUS METALS

Any of the following metals: gold, iridium, osmium, palladium, platinum, rhodium, ruthenium, and silver.

BB.   PROFITS

The amount that would have been received by the Insured from the sale of goods belonging to the Insured in excess of the cost to the Insured of acquiring, producing, manufacturing, or otherwise coming into possession of such goods.

CC.   RATE OF GROSS PROFITS

The RATE OF GROSS PROFITS earned on SALES which would have occurred during the twelve (12) consecutive calendar months immediately following the date of physical loss or damage insured by this POLICY to INSURED PROPERTY.

DD.   RAW STOCK

Material in the state in which the Insured receives it for conversion by the Insured into STOCK IN PROCESS or FINISHED GOODS.

EE.   SALES

The amount paid or payable to the Insured for goods sold or delivered and for services rendered in the conduct of the business at INSURED LOCATION(S).

FF.   SECURITIES

a.    All negotiable and non-negotiable instruments or contracts representing either MONEY or other property;

b.    SECURITIES include accounts, bills, bonds, stocks, food stamps, other evidences of debt or revenue, other stamps in current use, tokens, tickets, evidences of title and letter of credit.  SECURITIES do not include MONEY.

GG.   STANDARD SALES

The SALES during that period in the twelve (12) consecutive calendar months immediately prior to the date of the physical loss or damage to INSURED PROPERTY that corresponds with the **Period of Liability**

HH.   STOCK IN PROCESS

RAW STOCK which has undergone any aging, seasoning, mechanical or other process of manufacture at INSURED LOCATION(S) but which has not become FINISHED GOODS.

II.    TIME ELEMENT

A type or category of loss which is dependent, with respect to quantification, upon the passage of a period of time measured from a specific event.  A coverage provision or series of provisions pertaining to such loss.  Examples of such provisions include **Gross Earnings, Gross Profits, Extra Expense, Rental Insurance, Contingent Time Element, Service Interruption – Time Element, Leasehold Interest, Commissions, Licensing Fees and Royalties, Ingress/Egress, Order of Civil or Military Authority**, and **Soft Costs**.

JJ.    CRITICAL U.S. NAMED WINDSTORM AREAS

a.    When a CRITICAL U.S. NAMED WINDSTORM AREAS Deductible(s) applies under the POLICY, CRITICAL U.S. NAMED WINDSTORM AREAS shall mean LOCATION(S) situated wholly or partially in:

Alabama

Counties of Baldwin, Mobile

Florida

Entire state

Georgia

Counties of Brantley, Bryan, Camden, Charlton, Chatham, Effingham, Glynn, Liberty, Long, McIntosh, Wayne

Guam

Entire Territory

Hawaii

Entire state

Louisiana

Parishes of Acadia, Ascension, Assumption, Calcasieu, Cameron, Iberia, Jefferson, Jefferson Davis, Lafayette, Lafourche, Livingston, Orleans, Plaquemines, St. Bernard, St. Charles, St. Helena, St. James, St. John the Baptist, St. Martin, St. Mary, St. Tammany, Tangipanoa, Terrebonne, Vermilion, Washington

Mississippi

Counties of George, Hancock, Harrison, Jackson, Pearl River, Stone

North Carolina

Counties of Beaufort, Bertie, Bladen, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Duplin, Gates, Greene, Hertford, Hyde, Jones, Lenoir, Martin, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Pitt, Tyrrell, Washington

Puerto Rico

Entire island

South Carolina

Counties of Beaufort, Berkeley, Charleston, Colleton, Dillon, Dorchester, Florence, Georgetown, Hampton, Horry, Jasper, Marion, Williamsburg

Texas

Counties of Aransas, Bee, Brazoria, Brooks, Calhoun, Cameron, Chambers, Fort Bend, Galveston, Goliad, Hardin, Harris, Hidalgo, Jackson, Jefferson, Jim Wells, Kenedy, Kleberg, Liberty, Live Oak, Matagorda, Nueces, Orange, Refugio, San Patricio, Victoria, Wharton, Willacy

Virginia

Counties of Accomack, Charles City, Gloucester, Isle of Wright, James City, Lancaster, Mathews, Middlesex, New Kent, Northampton, Northumberland, Prince George, York and Independent cities: Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg

U.S. Virgin Islands

All islands

b. When a SECONDARY CRITICAL U.S. NAMED WINDSTORM AREAS Deductible(s) applies under the POLICY, SECONDARY CRITICAL U.S. NAMED WINDSTORM AREAS shall mean LOCATION(S) situated wholly or partially in:

Connecticut

Counties of Fairfield, Middlesex, New Haven, New London

Delaware

Counties of Kent, New Castle, Sussex

Maryland

Counties of Anne Arundel, Baltimore, Baltimore City, Calvert, Caroline, Cecil, Charles, Dorchester, Harford, Howard, Kent, Prince George's, Queen Anne's, Somerset, St. Mary's, Talbot, Wicomico, Worchester

Massachusetts

Counties of Barnstable, Bristol, Dukes, Nantucket, Plymouth

New Jersey

Counties of Atlantic, Bergen, Burlington, Cape May, Morris, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Passaic, Salem, Somerset, Union

New York

Counties of Bronx, Kings, Nassau, New York, Queens, Richmond, Rockland, Suffolk, Westchester

Rhode Island

Counties of Bristol, Kent, Newport, Providence, Washington

If a LOCATION(S) is situated partially in a CRITICAL U.S. NAMED WINDSTORM AREAS and particularly in a SECONDARY CRITICAL U.S. NAMED WINDSTORM AREAS the entire LOCATION(S) shall be treated as if situated in the CRITICAL U.S. NAMED WINDSTORM AREAS.

KK. VALUABLE PAPERS AND RECORDS

Written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, but not MONEY, SECURITIES, ELECTRONIC DATA, ELECTRONIC DATA PROCESSING MEDIA.

LL. WAITING PERIOD

A continuous period of time which must elapse before there is any liability for loss under this POLICY.

MM. WIND

Direct action of wind including substance driven by wind. WIND does not mean or include anything defined as FLOOD in this POLICY.

## *North American Elite Insurance Company*

### Endorsement 1
### WASHINGTON AMENDATORY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Subject to all terms, conditions and stipulations of the POLICY to which this endorsement is attached, and providing that this endorsement does not result in terms less favorable to the Insured, this endorsement modifies coverage under this POLICY as follows.

A.    The **Notice of Cancellation** condition in this POLICY is amended by the following:

1.    The Insured shown in the Declarations may cancel this POLICY by mailing or delivering to the Company advance written notice of cancellation.

2.    The Company may cancel this POLICY by mailing or delivering to the Insured and the Insured's agent or broker, written notice of cancellation, including the actual reason for the cancellation, to the last mailing address known to the "Company," at least:

    a.    10 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or

    b.    45 days before the effective date of cancellation if the Company cancels for any other reason.

except as provided in paragraph **3.** below.

3.    The Company may cancel this POLICY, by mailing or delivering to the Insured and the Insured's agent or broker, written notice of cancellation at least 5 days before the effective date of cancellation for any structure where 2 or more of the following conditions exist:

    a.    Without reasonable explanation, the structure is unoccupied for more than 60 consecutive days, or at least 65% of the rental units are unoccupied for more than 120 consecutive days unless the structure is maintained for seasonal occupancy or is under construction or repair;

    b.    Without reasonable explanation, progress toward completion of permanent repairs to the structure has not occurred within 60 days after receipt of funds following satisfactory adjustment or adjudication of loss resulting from a fire;

    c.    Because of its physical condition, the structure is in danger of collapse;

    d.    Because of its physical condition, a vacation or demolition order has been issued for the structure, or it has been declared unsafe in accordance with applicable law;

    e.    Fixed and salvageable items have been removed from the structure, indicating an intent to vacate the structure;

    f.    Without reasonable explanation, heat, water, sewer, and electricity are not furnished for the structure for 60 consecutive days; or

    g.    The structure is not maintained in substantial compliance with fire, safety and building codes.

4.    The Company will also mail or deliver to any mortgagee, pledgee or other person shown in this POLICY to have an interest in any loss which may occur under this POLICY, at their last mailing address known to the "Company," written notice of cancellation prior to the effective date of cancellation. If cancellation is for reasons other than those contained in paragraph **A.3.** above, this notice will be the same as that mailed or delivered to the Insured. If cancellation is for a reason contained in paragraph

**A.3.** above, the Company will mail or deliver this notice at least 20 days prior to the effective date of cancellation.

SP 10 520 0715    Includes copyrighted material of Insurance Services Office, Inc. with its permission.    Page 1 of 4

NAE Policy Number NAP 2001943 01

## *North American Elite Insurance Company*

5.  Notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

6.  a.  If this POLICY is cancelled, the Company will send the Insured any premium refund due. If the Company cancels, the refund will be pro rata.

    b.  If the Insured cancels, the refund will be at least 90% of the pro rata refund.

    c.  The cancellation will be effective even if the Company has not made or offered a refund.

7.  If notice is mailed, proof of mailing will be sufficient proof of notice.

B.  The following provision is added to this POLICY:

### Nonrenewal

The Company may elect not to renew this POLICY by mailing or delivering written notice of nonrenewal, stating the reasons for nonrenewal, to the Insured and the Insured's agent or broker at their last mailing addresses known to the "Company." The Company will also mail to any mortgagee, pledgee or other person shown in this POLICY to have an interest in any loss which may occur under this POLICY, at their last mailing address known to the "Company," written notice of nonrenewal. The Company will mail or deliver these notices at least 45 days before the:

1.  Expiration of the POLICY; or

2.  Anniversary date of this POLICY if this POLICY has been written for a term of more than one year.

Otherwise, the Company will renew this POLICY unless:

a.  The Insured fails to pay the renewal premium after the Company has expressed its willingness to renew, including a statement of the renewal premium, to the Insured and the Insured's agent or broker at least 20 days before the expiration date; or

b.  Other coverage acceptable to the Insured has been procured prior to the expiration date of the POLICY.

C.  EARTH MOVEMENT coverage, if any, under this POLICY, is amended by the following:

### Volcanic Action

1.  Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

    a.  Volcanic blast or airborne shock waves; or

    b.  Ash, dust or particulate matter.

    This endorsement does not provide coverage for damage to:

    (1)  Land;

    (2)  Property in the open or in open sheds; or

    (3)  Portions of buildings not completely enclosed, or personal property contained within those buildings.

    All volcanic eruptions that occur within any 168 hour period will constitute a single OCCURRENCE.

2.  Removal. Direct loss includes the cost to:

    a.  Remove the ash, dust or particulate matter from the interior and exterior surfaces of the covered building; and

    b.  Clean equipment and stock. If stock cannot be returned to its state before the volcanic eruption, the measure of loss will be the reduction in ACTUAL CASH VALUE.

    Payment for removal applies only to the initial deposit of ash, dust or particulate matter following a volcanic eruption. Subsequent deposits arising from the movement of volcanic dust or ash by wind or other means are not covered.

# *North American Elite Insurance Company*

3.   Volcanic Action does not include loss caused by, resulting from, contributed to or aggravated by:

    a.   Fire;

    b.   Explosion;

    c.   FLOOD, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not; or

    d.   EARTH MOVEMENT, including but not limited to earthquake, volcanic eruption, landslide, mine subsidence, lava flow, mud flow, earth sinking, earth rising or shifting.

D.   The following provision is added to this POLICY:

The term ACTUAL CASH VALUE means:

    a.   When the damage to property is economically repairable, ACTUAL CASH VALUE means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence.

    b.   When the loss or damage to property creates a total loss, ACTUAL CASH VALUE means the market value of property in a used condition equal to that of the destroyed property, if reasonably available on the used market.

    c.   Otherwise, ACTUAL CASH VALUE means the market value of new, identical or nearly identical property less reasonable deduction for wear and tear, deterioration and obsolescence.

E.   The **Other Insurance** condition in this POLICY is replaced by the following:

    1.   The Insured may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this POLICY. If the Insured does, the Company will pay its share of the covered loss or damage. The Company's share is the proportion that the applicable limit of liability under this POLICY bears to the applicable limits of liability of all insurance covering on the same basis.

    2.   If there is other insurance covering the same loss or damage, other than that described in **1.** above, the Company will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether the Insured can collect on it or not. But the Company will not pay more than the applicable limit of liability.

F.   The **Underlying Insurance** condition in this POLICY is replaced by the following:

Permission is granted the Insured to purchase insurance on all or any part of the deductibles of this POLICY, and the existence of such underlying insurance shall not prejudice any recovery otherwise payable under this POLICY. If the limits of such underlying insurance exceed the deductible which would apply under this POLICY, then the insurance provided by this POLICY shall apply in accordance with Paragraph **E.,** Other Insurance condition in this endorsement.

G.   The following provision is added to this POLICY:

**Examination of the Insured's Books and Records**

The Company may examine and audit the Insured's books and records as they relate to this POLICY at any time during the **Policy Period** and up to three years afterward.

H.   The **Inspection of Property and Operations** condition in this POLICY is amended by the following:

    1.   The Company has the right but is not obligated to:

        a.   Make inspections and surveys at any time;

        b.   Give the Insured reports on the conditions the Company finds; and

        c.   Recommend changes.

    2.   The Company is not obligated to make any inspections, surveys, reports or recommendations and any such actions the Company does undertake relate only to insurability and the premiums to be charged. The Company does not make safety inspections. The Company does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And the Company does not warrant that conditions:

SP 10 520 0715     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     Page 3 of 4

NAE Policy Number NAP 2001943 01

## *North American Elite Insurance Company*

    a.    Are safe or healthful: or

    b.    Comply with laws, regulations, codes or standards.

3.    Paragraphs **1.** and **2.** of this condition apply not only to the Company, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4.    Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations the Company may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

I.    The following provision is added to this POLICY:

VEHICLES: The word "vehicles" as used in this POLICY means vehicles running on land or track, but not aircraft.

J.    The **Appraisal** provision in this POLICY is amended by the following:

If there is an appraisal, the Company will still retain its right to deny the claim.

K.    The **Suit** provision in this POLICY is amended by the following:

No one may bring a legal action against the Company under this POLICY unless:

1.    There has been full compliance with all of the terms of this POLICY: and

2.    The action is brought within two years after the date on which the direct physical loss or damage occurred.

If this action is brought pursuant to Sec. 3 of RCW 48.30 then 20 days prior to filing such an action, the Insured is required to provide written notice of the basis for the cause of action to the Company and the Office of the Insurance Commissioner. Such notice may be sent by regular mail, registered mail, or certified mail with return receipt requested.

L.    The following provision is added to this POLICY:

If this POLICY (or an endorsement to this POLICY) excludes loss or damage caused by a "certified act of terrorism" or "terrorism," the following paragraph is added to such exclusion(s) and supersedes any provision to the contrary:

Loss or damage will be considered to have been caused by such excluded event if the OCCURRENCE of that event:

1.    Directly and solely results in loss or damage; or

2.    Initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

NAE Policy Number NAP 2001943 01

# *NORTH AMERICAN ELITE INSURANCE COMPANY*

Endorsement No: 2

## ADDITIONAL NAMED INSURED INTEREST ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provision(s) is (are) hereby attached to and made a part of this POLICY.

**Additional Named Insured Interest**

This POLICY is extended to cover the interest of the below named as an Additional Named Insured as their interest may appear.

**Additional Named Insured(s)**          **Address**

**Contractor(s) and subcontractor(s) of every tier and any other individual(s) or entity(ies), but only to the extent required by a written agreement, contract or sub-contract for property covered by this POLICY that have been agreed to and executed prior the date of loss, and only to the extent as their respective interests may appear in INSURED PROPERTY. Such interests become effective on the dates shown in such written agreements, contracts or sub-contracts but do not further amend or extend the terms, conditions, provisions and limitations of this POLICY.**

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

# *NORTH AMERICAN ELITE INSURANCE COMPANY*

## Endorsement 3

### BOILER AND MACHINERY ADDITIONAL SUBLIMIT(S) OF LIABILITY ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provision(s) is (are) hereby attached to and made a part of this POLICY.

The following Program Sublimit(s) is (are) hereby added to this POLICY:

| Program Sublimit(s) | Type of Loss, Cause of Loss and Coverage |
|---|---|
| **$160,000,000** | BOILER AND MACHINERY <, further sublimited as follows> |
| $500,000 | Water damage limitation - If INSURED PROPERTY is damaged by water as a result of loss or damage as insured against this POLICY to covered refrigerating or air conditioning vessels and piping, the limit of the Company's liability for this type of damage, including salvage expense, shall not exceed the water damage limitation amount shown above.] |
| $500,000 | Consequential (spoilage) damage limitation - If INSURED PROPERTY suffers spoilage from lack of power, light, heat, steam or refrigeration, resulting from loss or damage as insured against by this POLICY to a covered object which is situated on an INSURED LOCATION and which provides power, light, heat, steam or refrigeration, the limit of the Company's liability for this type of damage, including salvage expense, shall not exceed the consequential (spoilage) damage limitation amount shown above. ] |
| $500,000 | Ammonia contamination to INSURED PROPERTY as insured against under this POLICY. Stated sublimit includes salvage expense if any.] |
| $500,000 | Expediting expense as insured against under the **Expediting Expenses** provision of this POLICY.] |
| $500,000 | HAZARDOUS SUBSTANCES - The term HAZARDOUS SUBSTANCES means any solid, liquid, gaseous, or thermal irritant, CONTAMINANT(S), or pollutant, which includes, but is not limited to, smoke, soot, vapor, fumes, acids, alkalis, chemicals, bacteria, fungi, mold, viruses, spores, vaccines, and waste. Waste includes materials to be reconditioned, recycled, or reclaimed.] |
| $500,000 | Ordinance or law or contingent operation of business laws as insured against under the **Demolition and Increased Cost of Construction** provision of this POLICY.] |

For the purposes of this endorsement, BOILER AND MACHINERY shall mean:

1. explosion in or of the following property owned, operated or controlled by the Insured: steam boilers, including equipment attached to and forming a part thereof; steam turbines; steam engines; steam pipes interconnecting any of the foregoing; or gas turbines; except that liability is specifically assumed for loss resulting from EXPLOSION of accumulated gases or unconsumed fuel within the firebox (or the combustion chamber) of any fired vessel, other than gas turbines, or within the flues or passages which conduct the gases of combustion there from;

2. rupture, bursting, cracking, burning or bulging of: steam boilers including equipment attached to and forming a part thereof; steam turbines; steam engines; steam pipes interconnecting any of the foregoing; hot water

## NORTH AMERICAN ELITE INSURANCE COMPANY

boilers or other equipment for heating water; pressure vessels, including equipment attached to and forming a part thereof; or, gas turbines;

3. mechanical or machinery breakdown, including rupture or bursting caused by centrifugal force;

4. electrical injury or disturbance to electrical appliances, devices, fixtures, wiring, or other electrical or electronic equipment caused by electrical currents artificially generated;

As used in this endorsement, EXPLOSION shall mean: explosion, except loss by explosion in or of the following property owned, operated or controlled by the Insured:

1. steam boilers, steam turbines, steam engines, steam pipes interconnecting any of the foregoing, or gas turbines;

2. moving or rotating machinery or parts of same when such loss is caused by centrifugal force or mechanical breakdown;

3. any property undergoing pressure test to the extent of loss to such property undergoing test, including equipment attached to and forming part of such property.

The foregoing exceptions (1. through 3.) are modified to the extent that liability is specifically assumed for loss resulting from:

a. malicious use of explosives;

b. EXPLOSION of accumulated gases or unconsumed fuel within the firebox (or the combustion chamber) of any fired vessel, other than gas turbines, or within the flues or passages which conduct the gases of combustion there from.

The following are not EXPLOSIONS within the intent or meaning of this endorsement:

i. electric arcing or any coincident rupture of electrical equipment due to such arcing;

ii. bursting, rupture or collapse caused by freezing;

iii. shock waves generated by aircraft, generally known as sonic boom;

iv. bursting, rupture or collapse of any safety disc, rupture diaphragm or fusible plug.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

## *North American Elite Insurance Company*

Endorsement No: 4
### CANADIAN LIST OF STATUTORY CONDITIONS

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provision(s) is (are) hereby attached to and made a part of this POLICY.

#### Statutory Conditions

#### Misrepresentation

1.   If a person applying for insurance falsely describes the property to the prejudice of the Company, or misrepresents or fraudulently omits to communicate any circumstance that is material to be made known to the Company in order to enable it to judge of the risk to be undertaken, the POLICY is void as to any property in relation to which the misrepresentation or omission is material.

#### Property of Others

2.   Unless otherwise specifically stated in the POLICY, the Company is not liable for loss or damage to property owned by any person other than the Insured, unless the interest of the Insured therein is stated in the POLICY.

#### Change of Interest

3.   The Company is liable for loss or damage occurring after an authorized assignment under the Bankruptcy Act or change of title by succession, by operation of law, or by death.

#### Material Change

4.   Any change material to the risk and within the control and knowledge of the Insured avoids the POLICY as to the part affected thereby, unless the change is promptly notified in writing to the Company or its local agent, and the Company when so notified may return the unearned portion, if any, of the premium paid and cancel the POLICY, or may notify the Insured in writing that, if the Insured desires the POLICY to continue in force, the Insured must, within fifteen days of the receipt of the notice, pay to the Company an additional premium, and in default of such payment the POLICY is no longer in force and the Company shall return the unearned portion, if any, of the premium paid.

#### Termination

5.   (1)   This POLICY may be terminated,

     (a)   by the Company giving to the Insured fifteen days' notice of termination by registered mail or five days' written notice of termination personally delivered;

     (b)   by the Insured at any time on request.

    (2)   Where this POLICY is terminated by the Company,

     (a)   the Company shall refund the excess of premium actually paid by the Insured over the pro rata premium for the expired time, but, in no event, shall the pro rata premium for the expired time be deemed to be less than any minimum retained premium specified; and

     (b)   the refund shall accompany the notice unless the premium is subject to adjustment or determination as to amount, in which case the refund shall be made as soon as practicable.

    (3)   Where this POLICY is terminated by the Insured, the Company shall refund as soon as practicable the excess of premium actually paid by the Insured over the short rate premium for the expired time, but in no event shall the short rate premium for the expired time be deemed to be less than any minimum retained premium specified.

    (4)    The refund may be made by money, postal or express company money order or check payable at par.

    (5)    The fifteen days mentioned in clause (a) of subcondition (1) of this condition commences to run on the day following the receipt of the registered letter at the post office to which it is addressed.

**Requirements After Loss**

**6.**    (1)    Upon the OCCURRENCE of any loss or damage to the INSURED PROPERTY, the Insured shall, if the loss or damage is covered by the POLICY, in addition to observing the requirements of conditions 9, 10 and 11,

        (a)    forthwith give notice thereof in writing to the Company;

        (b)    deliver as soon as practicable to the Company a proof of loss verified by a statutory declaration,

            (i)    giving a complete inventory of the destroyed and damaged property and showing in detail quantities, costs, ACTUAL CASH VALUE and particulars of amount of loss claimed,

            (ii)    stating when and how the loss occurred, and if caused by fire or explosion due to ignition, how the fire or explosion originated, so far as the Insured knows or believes,

            (iii)    stating that the loss did not occur through any willful act or neglect or procurement, means or connivance of the Insured,

            (iv)    showing the amount of other insurances and the names of other insurers,

            (v)    showing the interest of the Insured and of all others in the property with particulars of all liens, encumbrances and other charges upon the property,

            (vi)    showing any changes in title, use, occupation, LOCATION, possession or exposures of the property since the issue of the POLICY,

            (vii)    showing the place where the INSURED PROPERTY was at the time of loss;

        (c)    if required, give a complete inventory of undamaged property and showing in detail quantities, cost, ACTUAL CASH VALUE;

        (d)    if required and if practicable, produce books of account, warehouse receipts and stock lists, and furnish invoices and other vouchers verified by statutory declaration, and furnish a copy of the written portion of any other policy.

    (2)    The evidence furnished under clauses (c) and (d) of sub-paragraph (1) of this condition shall not be considered proofs of loss within the meaning of conditions 12 and 13.

**Fraud**

**7.**    Any fraud or willfully false statement in a statutory declaration in relation to any of the above particulars, vitiates the claim of the person making the declaration.

**Who May Give Notice and Proof**

**8.**    Notice of loss may be given and proof of loss may be made by the agent of the Insured named in the POLICY in case of absence or inability of the Insured to give the notice or make the proof, and absence or inability being satisfactorily accounted for, or in the like case, or if the Insured refuses to do so, by a person to whom any part of the insurance money is payable.

**Salvage**

9.    (1)   The Insured, in the event of any loss or damage to any INSURED PROPERTY under the POLICY, shall take all reasonable steps to prevent further damage to such property so damaged and to prevent damage to other INSURED PROPERTY hereunder including, if necessary, its removal to prevent damage or further damage thereto.

      (2)   The Company shall contribute pro rata towards any reasonable and proper expenses in connection with steps taken by the Insured and required under sub-paragraph (1) of this condition according to the respective interests of the parties.

**Entry, Control, Abandonment**

10.   After loss or damage to INSURED PROPERTY, the Company has an immediate right of access and entry by accredited agents sufficient to enable them to survey and examine the property, and to make an estimate of the loss or damage, and, after the Insured has secured the property, a further right of access and entry sufficient to enable them to make appraisement or particular estimate of the loss or damage, but the Company is not entitled to the control or possession of the INSURED PROPERTY, and without the consent of the Company there can be no abandonment to it of INSURED PROPERTY.

**Appraisal**

11.   In the event of disagreement as to the value of the INSURED PROPERTY, the property saved or the amount of the loss, those questions shall be determined by appraisal as provided under The Insurance Act before there can be any recovery under this POLICY whether the right to recover on the POLICY is disputed or not, and independently of all other questions.   There shall be no right to an appraisal until a specific demand therefore is made in writing and until after proof of loss has been delivered.

**When Loss Payable**

12.   The loss is payable within sixty days after completion of the proof of loss, unless the POLICY provides for a shorter period.

**Replacement**

13.   (1)   The Company, instead of making payment, may repair, rebuild, or replace the property damaged or lost, giving written notice of its intention so to do within thirty days after receipt of the proofs of loss.

      (2)   In that event the Company shall commence to so repair, rebuild, or replace the property within forty-five days after receipt of the proofs of loss, and shall thereafter proceed with all due diligence to the completion thereof.

**Action**

14.   Every action or proceeding against the Company for the recovery of any claim under or by virtue of this POLICY is absolutely barred unless commenced within one year (two years in Province of Manitoba, British Columbia and Yukon Territory) next after the loss or damage occurs.

**Notice**

15.   Any written notice to the Company may be delivered at, or sent by registered mail to, the chief agency or head office of the Company in the Province.   Written notice may be given to the Insured named in the POLICY by letter personally delivered to the Insured or by registered mail addressed to the Insured at the Insured's latest post office address as notified to the Company.   In this condition, the expression REGISTERED means registered in or outside Canada.

**Additional Conditions**

**Notice to Authorities**

I.   Where the loss is due to malicious acts, burglary, robbery, theft or attempt thereat, or is suspected to be so due, the Insured shall give immediate notice to the police or other authorities having jurisdiction.

**LOCATIONS Where Applicable**

II.  This POLICY applies to described LOCATIONS in Canada not otherwise subject to the Quebec Insurance Act or any other Provincial or Territorial Insurance Act, as applicable.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

# North American Elite Insurance Company

## Endorsement 5

### CANADIAN PROPERTIES ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provision(s) is (are) hereby attached to and made a part of this POLICY.

This POLICY covers properties located in Canada and in the United States:

a. Reference made in this POLICY to statutes of the state(s) wherein property is located includes statutes of the province(s) or territory(ies) of Canada wherein property is located:

b. Coverage on Canadian properties is subject to the conditions of the Standard Fire Insurance Policy of the province(s) or territory(ies) in which individual properties are located when such conditions are broader than those provided by this POLICY;

c. Liability under this POLICY and premium indicated for coverage afforded in respect to Canadian properties are both stated in U.S. dollars and all losses under this POLICY will be adjusted and made payable in U.S. dollars.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

## *North American Elite Insurance Company*

### Endorsement 6
### EXCLUSION OF CERTIFIED ACTS OF TERRORISM

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provision(s) is (are) hereby attached to and made a part of this POLICY.

A.    The following definition is added with respect to the provisions of this endorsement:

CERTIFIED ACT OF TERRORISM means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to the Act. The criteria contained in the Terrorism Risk Insurance Act for a CERTIFIED ACT OF TERRORISM include the following:

1.    The act resulted in insured losses in excess of S5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.    The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B.    The following exclusion is added:

### CERTIFIED ACT OF TERRORISM EXCLUSION

The Company will not pay for loss or damage caused directly or indirectly by a CERTIFIED ACT OF TERRORISM. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

C.    **Exception Covering Certain Fire Losses**

If direct physical loss or damage by fire results from a CERTIFIED ACT OF TERRORISM (unless committed by or on behalf of the Insured) to property insured by this POLICY that is located in a jurisdiction whose statutory law requires such resulting direct physical loss or damage to be covered by a standard fire policy, the Company will pay for the loss or damage caused by that fire, but only to the extent of the ACTUAL CASH VALUE of the resulting direct physical loss or damage by fire to insured property, subject to all applicable POLICY provisions including the Limit of Liability on the affected property. Such coverage for fire applies only to direct loss or damage by fire to covered property. Therefore, for example, the coverage does not apply to insurance provided under **Time Element** coverages or endorsements that apply to those coverages.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed S100 billion in a calendar year and the Company has met its insurer deductible under the Terrorism Risk Insurance Act, the Company shall not be liable for the payment of any portion of the amount of such losses that exceeds S100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established be the Secretary of the Treasury.

D.    **Application Of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage which would otherwise be excluded under this POLICY, such as losses excluded by the nuclear exclusion or the war risk exclusion provisions of this POLICY.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

# North American Elite Insurance Company

Endorsement No: 7
## EXCLUSION - LOSS DUE TO AN ACT OF TERRORISM ENDORSEMENT

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### (Applies to property located in Canada)

The following provision(s) is (are) hereby attached to and made a part of this POLICY.

If the Policy Territory includes the country of Canada, the following provision is hereby added to the POLICY.

### Exclusion -- Loss Due To An ACT OF TERRORISM (Canadian Locations)

The following exclusion applies to property located in Canada:

1. Notwithstanding any provision in this POLICY or any endorsement thereto to the contrary, this POLICY does not insure against any loss, damage, cost or expense caused by or resulting from any of the following, regardless of any other cause or event contributing concurrently or in any other sequence thereto:
   ACT OF TERRORISM, or any action in hindering, combating or defending against the same, regardless of who commits or threatens the commission of the act or acts, and regardless of any other cause or event contributing concurrently or in any other sequence thereto.

   ACT OF TERRORISM means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      (i) Use or threat of force or violence; or

      (ii) Commission or threat of a dangerous act; or

      (iii) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (i) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (ii) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. In any action, suit or other proceeding where the Company alleges that, by reason of any provision in this endorsement, some or all loss or damage is not insured by this POLICY, the burden of proving that such loss or damage is not excluded shall be upon the Insured.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

## *North American Elite Insurance Company*

### Endorsement 8
#### LENDER'S LOSS PAYABLE ENDORSEMENT

#### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following provision(s) is (are) hereby attached to and made a part of this POLICY.

Applicable only to LOCATION No(s).: **See Below**

Insured: **SPACE NEEDLE, LLC**

LOCATION(S): **400 Broad Street, Seattle, WA 98109**

Loss, if any, under this POLICY to **Real and Personal Property** shall be payable to **Berkadia Commercial Mortgage** whose address is **P. O. Box 1687, Horsham, PA 19044, Loan #991065899** for an amount not exceeding $ATIMA as lender, mortgagee or trustee, as interest may appear.

It is understood that the lender, mortgagee or trustee now has or will acquire from time to time an insurable interest in certain property insured under this POLICY as established by documents of title, agreements, mortgages, indentures or other written evidence.

This insurance, solely as to the interest therein of the lender, mortgagee or trustee, shall not be impaired or invalidated by any act or neglect of the borrower, mortgagor or owner of the within described property except as provided in the last paragraph hereof, nor by any change in the title or ownership of the property, nor by the occupation of the premises wherein such property is located for purposes more hazardous than are permitted by this POLICY; provided that in case the borrower, mortgagor or owner shall neglect to pay any premium due under this POLICY, the lender, mortgagee or trustee shall, on demand, pay the same.

Provided also, that the lender, mortgagee or trustee shall notify the Company of any change of ownership or occupancy or increase of hazard which shall come to the knowledge of said lender, mortgagee or trustee and, unless permitted by this POLICY, it shall be noted thereon and the lender, mortgagee or trustee shall, on demand, pay the premium for such increased hazard for the term of the use thereof; otherwise this POLICY shall be null and void.

The Company reserves the right to cancel this POLICY at any time as provided by its terms, but in such case this POLICY shall continue in force for the benefit only of the lender, mortgagee or trustee for 30 days after notice to the lender, mortgagee or trustee of such cancellation and shall then cease and the Company shall have the right, on like notice, to cancel this agreement.

Whenever the Company shall pay the lender, mortgagee or trustee any sum for loss or damage under this POLICY and shall claim that, as to the borrower, mortgagor or owner, no liability therefor existed, the Company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the party to whom such payment shall be made under all securities held as collateral to the debt, or may at its option, pay the lender, mortgagee or trustee the whole principal due or to grow due on the debt with interest, and shall thereupon receive a full assignment and transfer of the debt and of the documents of title, agreements, mortgages, indentures or other written evidence of the interest of the lender, mortgagee or trustee in the within described property; but no subrogation shall impair the right of the lender, mortgagee or trustee to recover the full amount of its claim against the borrower, mortgagor or owner.

# North American Elite Insurance Company

All other terms and conditions of the POLICY to which this endorsement is attached and of which it is part, remain unchanged, which other terms and conditions include the limit(s) of liability named in the POLICY and the conditions of any value reporting, full reporting, total insurance, coinsurance or average clauses incorporated therein or attached thereto.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

# *North American Elite Insurance Company*

### Endorsement 9

### MISCELLANEOUS CHANGES ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### Coverage Purchased and Coverage Not Purchased Amendment

**Coverage Purchased and Coverage Not Purchased** (II.D.) of the **Policy Limits and Sublimits Purchased or Not Purchased** section of this POLICY is amended in the following particulars:

The following Program Sublimit(s) is (are) hereby added to this POLICY:

| Program Sublimit(s) | Type of Loss, Cause of Loss and Coverage |
|---|---|
| $100,000 | **CFC Refrigerants** |
| $6,000,000 | **Electronic Data Processing Equipment and Media Valuation** |
| $300,000 | **Fine Arts – Scheduled (Tsutakawa Fountain)** |
| $240,000 | **Fine Arts- Scheduled (Water's Edge: Year Round)** |
| $104,600 | **Fine Arts- Scheduled (Chihuly, Garden and Glass, Nine Foot Tall Bronze)** |
| $2,000,000 | **Off Premises Power – Property Damage and Time Element Combined** |
| $100,000 | **Personal Property of Others Including Fur/Fur Garments not to exceed $25,000 any one item** |
| $250,000 | **Pollutant Cleanup & Removal per Occurrence and Annual Aggregate** |
| $100,000 | **Royalties** |
| $100,000 | **Spoilage** |
| $500,000 | **Temporary Removal of Property** |

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

## *North American Elite Insurance Company*

Endorsement No: 10
**CONSTRUCTIVE TOTAL LOSS – SPECIAL PROVISION**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

A. Subject to all terms and conditions of this policy, not in conflict herewith, in the event of loss or damage as insured against by this policy which results in a "Constructive Total Loss" to property situated on "Described Premises" insured by this policy as indicated in the Agreed Amount Schedule shown below, then the Insured shall have the option either not to rebuild at all, or to rebuild at the same site or any other site within the Policy Territory of this policy.

"Constructive Total Loss" means covered property situated on "Described Premises" shown below that has suffered direct physical loss or damage as insured against by this policy in an amount exceeding 50% of its Property Damage Agreed Amount in accordance with the Agreed Amount Schedule shown below.

#### Agreed Amount Schedule:

| Description of Premises | Property Damage Agreed Amount - USD$ |
|---|---|
| Space Needle located at:<br><br>400 Broad Street<br>Seattle, WA 98109 | 79,500,000 |

B. For the purposes of this Constructive Total Loss – Special Provision, the policy is amended to apply the following valuation conditions:

1. In the event the Insured opts to not rebuild property situated on "Described Premises" insured by this policy shown herein the Agreed Amount Schedule, in accordance with the terms and conditions of this Constructive Total Loss – Special Provision, loss or damage to such insured property shall therefore be valued at the total replacement cost at the time and place of loss, subject to the following conditions:

   a. Indemnification to the insured under the terms of this Paragraph B.1 valuation provision shall not exceed the smaller of the following:

      i.   the Limit of Insurance applicable to the lost or damaged property;

      ii.  the cost which would have been expended by or on behalf of the Insured to repair, rebuild or replace the damaged or destroyed property on the same site with new materials of like kind and quality or with similar materials intended to perform the same function or purpose when replacement with identical property is not possible, whichever is the smallest;

   b. This Constructive Total Loss – Special Provision does not insure against any increase of loss resulting from enforcement of any law, ordinance, regulation or rule, regulating or restricting the construction, installation, repair, replacement, demolition, occupancy, operation or other use of property on "Described Premises."

   c. In the event that this policy contains an exclusion for Terrorism and a coverage extension for fire that results from Terrorism, this Constructive Total Loss – Special Provision does not insure against any physical loss or damage to property that is covered by reason of the coverage extension for fire that results from Terrorism.

## *North American Elite Insurance Company*

     d.    This Constructive Total Loss – Special Provision does not increase any amounts or limits of insurance provided by this policy.

2.    In the event the Insured opts to rebuild at the same site or any other site within the Policy Territory of this policy, in accordance with the terms and conditions of this Constructive Total Loss – Special Provision, loss or damage to such insured property shall therefore be valued as otherwise provided for in this policy at the time and place of loss.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

# *North American Elite Insurance Company*

Endorsement No: 11
## CONTROL OF DAMAGED GOODS ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### Control of Damaged Property

This POLICY gives control of physically damaged FINISHED GOODS or MERCHANDISE as follows:

a.   the Insured will have full rights to the possession and control of damaged FINISHED GOODS or MERCHANDISE in the event of physical loss or damage insured by this POLICY to such FINISHED GOODS or MERCHANDISE provided proper testing is done to show which FINISHED GOODS or MERCHANDISE is physically damaged;

b.   the Insured using reasonable judgment will decide if FINISHED GOODS or MERCHANDISE sustaining physical loss or damage can be reprocessed or sold;

c.   FINISHED GOODS or MERCHANDISE so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent; and

d.   any salvage proceeds received will go to the:

    I.   Company at the time of loss settlement; or

    II.   Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable hereunder.

e.   Notwithstanding, the foregoing paragraphs a. through d., the Insured shall allow the Insurer any salvage actually obtained on any sale or other disposition of such goods or products through normal insurance industry salvage practices.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

## *North American Elite Insurance Company*

Endorsement No: 12
### PROPERTY NOT INSURED REVISIONS

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Paragraph A1. Section VI Exclusions is hereby deleted, and the following is substituted:

A.1. bills, notes, MONEY, SECURITIES, PRECIOUS METALS, precious stones, semi-precious stones, jewelry

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured:

## *North American Elite Insurance Company*

Endorsement No: 13
### CERTIFICATES OF INSURANCE, MORTGAGEE,
### LENDER'S LOSS PAYABLE AND LOSS PAYEE ENDORSEMENTS

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The Companies grant permission to the producer of the Insured's account to issue on the Insured's behalf certificates of insurance, mortgagee, lender's loss payable, and loss payable endorsements only; provided that each certificate and endorsement (i) is fully subject to the entire policy; (ii) does not increase the financial exposure or obligation of the Companies; (iii) is not issued to any mortgagee or lender's loss payee that is also an additional insured hereunder; (iv) is filed with the Companies within fourteen (14) days after issuance; and (v) each endorsement contains in the Remarks section the disclosure that appears in the next paragraph of this policy. Any breach of the requirements for a certificate or endorsement automatically renders that certificate or endorsement void for all purposes.

Disclosure that must appear in the Remarks section of each endorsement

Endorsement holder is included as [SELECT ONE: MORTGAGEE; LENDER'S LOSS PAYEE; OR LOSS PAYEE]. as its interest may appear; provided that each endorsement (i) is fully subject to the entire policy; (ii) does not increase the financial exposure or obligation of the Companies; (iii) is not issued to any mortgagee or lender's loss payee that is also an additional insured hereunder; and (iv) is filed by the broker with the Companies within fourteen (14) days after issuance. Any breach of the requirements for an endorsement automatically renders that endorsement void for all purposes.

All other terms and conditions of this policy shall remain unchanged.

This endorsement forms a part of the policy to which attached, effective on the inception date of the policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to the preparation of the policy.)

Policy Number:

Endorsement Effective Date:

Named Insured: